22a

8/14

COURT OF COMMON PLEAS OF WAYNE COUNTY

---

COMMONWEALTH ~~ORIGINAL~~

vs.                                          :  No. 42-1986-Criminal

STEVEN L. ROMANSKY              :     1:CV-00-1520

---

Excerpts of the trial held at the Wayne

County Courthouse, Honesdale, Pennsylvania, beginning

on Monday, September 15, 1986, before The Honorable

Robert J. Conway, P.J.

**FILED**
**HARRISBURG**

---

AUG 15 2001

APPEARANCES:

MARY E. D'ANDREA, CLERK

DEPUTY CLERK

OFFICE OF ATTORNEY GENERAL
GREGORY B. ABELN, ESQ.,
DEPUTY ATTORNEY GENERAL
Strawberry Square
Harrisburg, Pa. 17120
    for the Commonwealth

RANDOLPH T. BORDEN, P.C.
by RANDOLPH T. BORDEN, ESQ.
Star Route 2, Box 24
Hawley, Pa. 18428
    for the defendant

---

## FRANK A. CONDON

VERBATIM REPORTER · NOTARY PUBLIC

---

4( NORTH SIXTH STREET, STROUDSBURG, PA 18360  ●  (717) 421-3520

23a

I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| TROOPER WALTER MOSCHOWSKY | 3 | 44 | 66 | 89 |
| RUSSELL L. THOMAS | 91 | 96 | 100 | -- |

E X H I B I T S

| COMMONWEALTH | | PAGE |
|---|---|---|
| 23 | Dowgard container | 61 |

---

1          REINHARD WAGNER, COURT CRIER:  Remain seated.

2    Come to order.  Court is now in session.

3          THE COURT:  All right.  We have the members of

4    the jury, everyone else.  Parties, proceed.

5          MR. ABELN:  Thank you, your Honor, for the

6    patience that you've shown.

7          I call Trooper Walter Moschowsky.

8               ---

9          TROOPER WALTER MOSCHOWSKY, called on behalf of

10   the Commonwealth, having been duly sworn, was examined and

11   testified as follows:

12          LINDA SODEN, COURT CLERK:  Please state your

13   name.

14          THE WITNESS:  Walter Moschowsky.

15          LINDA SODEN, COURT CLERK:  Thank you.  Please

16   be seated.

17   DIRECT EXAMINATION ON QUALIFICATIONS

18   BY MR. ABELN:

19   Q    Trooper, spell your name for the record.

20   A    M-o-s-c-h-o-w-s-k-y.

21   Q    What's your occupation?

22   A    Trooper, Pennsylvania State Police Fire Marshal Division

23   Q    How long have you been a Trooper?

24   A    Twenty-one years.

25   Q    How long have you been a Fire Marshal?

Moschowsky - direct

1   A      Approximately nine years.

2   Q      Where are you stationed now, Trooper?

3   A      Troop R, Dunmore.

4   Q      As a Fire Marshal, what specialized training have you

5   in the area of fire and arson investigation?

6   A      I have attended various seminars put on by the

7   Pennsylvania State Police Academy at Hershey, Pennsylvania,

8   ranging from 1969 to 1986.

9              MR. BORDEN:  Excuse me.  Your Honor, I am going

10  to object if the witness is testifying from some kind of note

11  that the defense has never even seen.  Is that --

12             THE COURT:  Yes.

13             THE WITNESS:  I testified from this at the

14  hearing, your Honor, the preliminary hearing.

15             THE COURT:  You want to take a look at it?

16             MR. BORDEN:  Yes, please.

17  BY MR. ABELN:

18  Q      Are those your qualifications listed?

19  A      Yes, sir.

20             MR. BORDEN:  Thank you, sir.

21             THE COURT:  Proceed.

22  A      In addition to those seminars, I'm also a member of the

23  Pennsylvania Association of Arson Investigators and the

24  International Association of Arson Investigators.

25         I've attended three seminars that were put on by the

1   Pennsylvania Association of Arson Investigators.  One was at

2   York College at York, Pennsylvania; one was at Boalsburg,

3   Pennsylvania; and the other one was at Penn State College --

4   State College, Pennsylvania.

5        In addition, I also attended an in depth arson fire

6   training course at The National Fire Academy in Emmitsburg,

7   Maryland.

8   BY MR. ABELN:

9   Q    Have you ever acted as an instructor, yourself, sir, in

10  arson and fire investigation?

11  A    I have.

12  Q    Have you ever testified before as an expert in various

13  county courts across the State of Pennsylvania?

14  A    I have.

15  Q    How many county courts have you been declared to be an

16  expert?

17  A    Four county courts, one magisterial court.

18  Q    Do you receive publications from your organizations?

19  A    I do.

20  Q    Do you review those and keep yourself up to date and

21  abreast of new developments?

22  A    Yes, I do.

23  Q    Have you ever had specialized training in motor vehicle

24  fires?

25  A    Yes, I have.

1   Q    Have you had classroom and field experience in

2   observation of motor vehicle fires?

3   A    Yes, I have.

4   Q    Have you talked to other experts in the field about

5   vehicle fires as to cause and effect?

6   A    I have.

7   Q    Have you read about motor vehicle fires?

8   A    I have.

9   Q    How many fires have you participated in in investigating

10  as a member of the Pennsylvania State Police, approximately?

11  A    I investigated approximately 600 fires.

12  Q    Were the majority of them incendiary?

13  A    They were.

14  Q    What does incendiary mean?

15  A    Deliberately set.

16  Q    How many people have you prosecuted for arson charges?

17           MR. BORDEN:  Objection.  Irrelevant.

18           THE COURT:  Sustained.

19           MR. ABELN:  Your Honor, at this time I would

20  offer the Trooper as an expert in the field of fire and arson

21  investigation and an expert in determining and testifying as

22  to its cause and effect.

23           MR. BORDEN:  If I could ask just a couple of

24  questions, your Honor?

25           THE COURT:  Certainly.

Moschowsky - dir

CROSS-EXAMINATION ON QUALIFICATIONS

BY MR. BORDEN:

Q    Trooper Moschowsky, you've indicated you've had specific training in motor vehicle fires. Would you tell us what that training is?

A    Cause and origin on motor vehicle fires.

Q    What training was that, sir? Where did you receive it?

A    In addition to regular seminars, I received that training at the Penn State seminar I attended for the Pennsylvania Association of Arson Investigators.

Q    When was that seminar?

A    I believe 1983.

Q    What portion of the seminar was devoted to motor vehicle fires? How long did that training take?

A    It was an -- it was a complete afternoon session. It included classroom training as well as practical field experience on burning three vehicles.

Q    Other than one-half afternoon of training on motor vehicle fires, have you received any other training in motor vehicle fires?

A    I've read quite a bit of literature.

Q    We'll get to that in a minute, sir. I mean as far as formal training, attending seminars, other than your one-half afternoon at Penn State in 1983, have you had any other formal education?

1   A    Education?  To a degree, but not as in depth as that was

2   Q    Okay.  Let me ask the question again.  Can you tell us

3   any other seminars that you attended dealing with motor vehicle

4   fires, other than the one-half day in 1983 at Penn State?

5   A    A majority of all the seminars touched on some vehicle

6   fire training.

7   Q    Can you tell us one?

8   A    One?

9   Q    Name one seminar, other than --

10  A    Penn State.

11  Q    -- other than the Penn State seminar in 1983.

12  A    A couple of the seminars I attended at the State Police

13  Academy in Hershey.

14  Q    When was that?

15  A    Ranged from 1969 to 1986.  There were, I believe, nine

16  seminars all tolled that I attended there, which one of the nine

17  or which three of the nine that actually presented that

18  particular phase of the instruction, I can't tell you exactly.

19  Q    That training that you received between 1969 and 1986

20  was less extensive than the Penn State.  Is that true?

21  A    On vehicle fires that's true.

22  Q    Yes, sir.

23  A    That's true on vehicle fires.

24  Q    You also stated that you read publications dealing with

25  motor vehicle fires.  Can you tell us the names of those

1   publications?

2   A    They're publications put out by the Pennsylvania

3   Association of Arson Investigators.   That's a particular

4   magazine that they put out.

5   Q    What's the name of the magazine, sir?

6   A    Exact name I'm not sure.

7   Q    You don't recall the name of --

8   A    No, I don't.   I receive several publications, some from

9   the barracks, some from the national, some from the

10  Pennsylvania Association of Arson Investigators.

11  Q    Can you give us the name of any publication that you

12  study motor vehicle fires from?

13  A    By name, no.

14           MR. BORDEN:   No objection to him being used as

15  an expert.

16           MR. ABELN:   Thank you, your Honor.

17              DIRECT EXAMINATION

18  BY MR. ABELN:

19  Q    Directing your attention to September 25th, 1984, Trooper

20  Moschowsky, which I believe was a Tuesday morning, did you

21  have an opportunity to go to the Pennsylvania State Police

22  Barracks in Honesdale?

23  A    I did.

24  Q    Did you make an investigation of the area behind the

25  barracks?

1    A    I did.

2    Q    What did you observe, and when did you get there?

3    A    I had received a call from Sergeant Lorent, who at that

4    time was the Station Commander at Honesdale, at approximately

5    9:05 in the morning that --

6            MR. BORDEN:  Objection.  Hearsay.

7            MR. ABELN:  Your Honor, it just goes to what

8    he did.  It doesn't prove anything as to the truth of the

9    matter asserted.  It's not hearsay by definition.

10            THE COURT:  I don't know since he didn't answer

11    the question.  Objection overruled.

12    A    When I received that phone call I then proceeded to the

13    Honesdale Barracks, and I arrived there at approximately ten

14    a.m. that same morning.

15        Upon arrival at the barracks I was more or less appraised

16    of approximately what had happened, that is that a fire had

17    occurred in the back of the barracks amongst some vehicles

18    that were being stored there that were part of a stolen

19    vehicle investigation that Honesdale Barracks had going.

20        After I had learned why they were there and what

21    more or less the makeup of the scene was, I then proceeded to

22    go through these vehicles, through the rows alongside the

23    vehicles, to try to get somewhat of a picture of what might

24    have happened.  While I was doing this I immediately observed

25    what appeared to me to be a flammable liquid pattern on the

1   ground around the vehicles, behind them, leading to the final

2   row, which there were three rows of vehicles, to a particular

3   vehicle, which was a white Cadillac.  At that point I then

4   observed the fact that this flammable liquid pattern on the

5   ground went from the back of this vehicle further on back to

6   alongside of a house trailer, which is being used as an office

7   trailer, and it was owned by a Mr. Swenson, who at that time

8   he also owns the property on which the barracks is situated.

9   The State Police lease the building and the property from him.

10  Approximately 15 to 20 feet down alongside this trailer is

11  where this flammable liquid pattern ended.

12       Looking at the entire picture that I observed, I was

13  able to visualize that approximately 10 vehicles within

14  approximately 31 vehicles had this flammable liquid pattern

15  going around them and through the rows to the back end, back

16  to the house trailer.  At the end of the flammable liquid

17  pattern on the ground there was a burnt book of matches lying

18  right on the ground in this pattern.  Approximately two feet

19  from the end of the pattern there where the matches were there

20  was a plastic antifreeze container just underneath the trailer

21  lying on the ground.

22       I then went back to where the vehicles were.  I now

23  observed that where the flammable liquid pattern was going

24  alongside the vehicles, these 10 vehicles had had the gas

25  caps removed from them, and they were either lying on the

1    ground or somewhere in the general area of the vehicle, itself,

2    either on a tire or on the ground, what have you.  In place

3    of the gas cap there were various, what I call, wicks.  What

4    they were were shirts, rags, and in one particular case a

5    plastic bag.  This plastic bag and these shirts and this rag

6    were stuffed into the gas fill pipe that would lead to the

7    gasoline tank, and they hung down the side of the vehicle.

8         In addition to observing that, alongside the white

9    Cadillac, which was in the back of the third row, right in

10   the flammable liquid pattern on the ground there was a one

11   gallon metal container that was partly charred or sooted from

12   the fire, and at the same time there was a similar type one

13   gallon metal can in the back of one of the pickup trucks in

14   the center of all of these vehicles.  Both cans had the same

15   appearance to them; both cans were sprayed with black paint;

16   both cans had a price mark on the top, which is written $23

17   on brown masking tape placed on top of the can; both cans had

18   a small amount of a syrupy heavy type liquid in it.

19        I later learned that both cans were Bondo Fiberglass

20   resin cans, which is used by a lot of -- in a lot of auto

21   shops for body work.

22        In addition, the rags or the wicks that were in the

23   vehicles, along with the flammable liquid area on the ground

24   and the plastic antifreeze container that I found by the

25   office trailer, all had the same similar odor to them.  Also,

1    in addition, one of the vehicles, a Bronco, that was in the

2    center of these 10 vehicles, I observed had in addition to

3    just the flammable liquid pattern around it like the other

4    vehicles, this vehicle also had something poured onto the

5    inside of it.  I found the left side rear window open, and

6    there was curtains on the inside of the windows, and I could

7    smell the curtains as well as the interior of the vehicle, and

8    the curtains and the interior of the vehicle had the same odor

9    as the flammable liquid pattern on the ground and the other

10   plastic container.

11          In addition, I also observed that that particular vehicle

12   had the most severe fire damage to it.  It was charred more

13   than any of the other vehicles.  A total of four of the 10

14   vehicles were slightly damaged by fire.

15          I also observed that a certain area of the flammable

16   liquid pattern, itself, on the ground was charred.  It had

17   burned.  Some of it didn't.

18          In addition , I also observed a dump truck, which would

19   have been to the rear of these vehicles and on the Honesdale

20   side of the office trailer, and this particular dump truck I

21   later learned was also owned by Mr. Swanson, the property

22   owner, and on the ground near it was a stain on the ground in

23   the dirt, which would indicate that something had been poured

24   there.  And when I had the opportunity of smelling that, it

25   also smelled the same as the flammable liquid pattern that was

1  around the cars and the vehicles.

2      From that it was quite obvious, then, to form an opinion

3  as to what had happened.

4              MR. ABELN:  With your Honor's permission, may

5  I approach the witness?

6              THE COURT:  Yes.

7              MR. ABELN:  Will you let the record reflect

8  that I've shown these exhibits to counsel, and I'm about to

9  present this to my witness.

10  BY MR. ABELN:

11  Q      Trooper Moschowsky, I'm going to show you a series of

12  photographs, and before you comment on any of the photographs,

13  I'd like you to look at that and also this.  The photographs

14  are marked as Exhibits 1 through 15, and the piece of paper is

15  marked as Commonwealth's Exhibit No. 18.

16      Would you review the photographs, please, and tell me

17  whether you recognize them or not.

18  A      [Witness complies.]   Yes, I do.

19  Q      What are those photographs, Trooper?

20  A      These are photographs of the fire scene out at Honesdale

21  Barracks.

22  Q      Do they accurately depict the view as you observed it

23  on September 25th, 1984?

24  A      Yes, they do.

25  Q      And they are accurate representations of where the cars

1   are situated and where the State Police Barracks is located?

2   A    They are.

3   Q    Would you look at Commonwealth's Exhibit No. 18 and tell

4   me what that is.

5   A    That's a rough sketch that I made of the area so that

6   I'd have something to refer to.

7              MR. ABELN:  Your Honor, I've taken the liberty

8   of Xeroxing off enough copies of that particular diagram to

9   submit to you, counsel, and the jurors.  I'd ask that I be

10  allowed to distribute those at this time.  I've spoken with

11  Mr. Borden about that.  He said he had no objection.

12             THE COURT:  Distribute them.

13             MR. ABELN:  You have a copy, Mr. Borden?

14             MR. BORDEN:  I do, sir.

15             MR. ABELN:  Your Honor, in addition, I have

16  shown a series of photographs, and I think I said 1 through 15

17  Yes, it is 1 through 15.  I have taken the liberty of taking

18  the negatives for those photographs and have had them

19  developed into slides, and I have informed counsel of this,

20  and I understand there's no objection to me putting the slides

21  as he refers to each exhibit, 1 through 15, on the screen

22  before the jury.

23             THE COURT:  All right.

24             MR. BORDEN:  No objection.

25             THE COURT:  Proceed.

1    MR. ABELN:  Thank you, your Honor.

2   BY MR. ABELN:

3   Q    Is there enough light there, Trooper Moschowsky, for you

4   to see the photographs?

5   A    I think I'll be all right.

6   Q    Directing, sir, your attention to Commonwealth's Exhibit

7   No. 1, the first photograph on there -- pardon me.  Let's go

8   back, and I ask you to indicate the purpose of your diagram on

9   Commonwealth's Exhibit No. 18.  Could you explain that to the

10  jury and what that diagram represents?

11  A    I drew up that diagram to sort of make the investigation

12  a little more simple as far as reference points.

13       You have on the top of the diagram you have the Route

14  191.  Then you have the Pennsylvania State Police Barracks.

15  You have a parking lot behind the barracks, and you have three

16  rows of confiscated vehicles.  You have the -- what I refer to

17  as the -- office trailer down at the bottom center.  Off to

18  the right of that office trailer you have the dump truck I

19  referred to, and you have marked alongside the left side of

20  the truck is the stain that was on the ground.

21       Also, there's a notation there that shows where the book

22  of matches was found by the office trailer.  And then looking

23  at the vehicles --

24  Q    I'm sorry.  Trooper, did you number each of these vehicles

25  1 through 31 for your own purposes?

1   A    I did.

2   Q    This diagram is not drawn to scale, is it?

3   A    No, it's not.

4        Explaining further, on those vehicles, the line that you

5   see going from the office trailer around vehicles 12 to 17

6   in the second row and 24 to 27 in the third row or the back

7   row there, that's the flammable liquid pattern that I observed

8   on the ground.

9        If you look closely on vehicle 25, 26, 27, 13, I believe

10  14, and 15, there is a little mark off the left rear portion

11  or the left rear corner of those vehicles.  That indicates

12  where those rags were coming out of the gasoline tanks, with

13  the exception of 27.  Now, 27 was the white Cadillac.  There

14  the rag came out of the rear of the vehicle behind the license

15  plate.  The license plate was right in the back of the vehicle,

16  and behind the license plate was the fill cap, and that's what

17  the rag came out of.

18  Q    Trooper, directing your attention to photograph No. 1,

19  it's Commonwealth's Exhibit No. 1, which I have presented on

20  the screen here for the front of the jury, could you tell me

21  what that scene depicts?

22  A    That's looking towards the direction of the barracks

23  from Route -- from over the top of Route 191, aerial view.

24  Q    Would this be the Pennsylvania State Police Barracks?

25  A    That's correct.

Case 1:00-cv-01320-SHR-DB    Document 18    Filed 08/15/2001    Page 18 of 126

1   Q      What would this area be back here, sir?

2   A      All those vehicles are the confiscated vehicles as far

3   as those rows.  Now, the one -- to try to explain it better,

4   you have the State Police Barracks there --

5   Q      Excuse me, Trooper.  Would it be to your advantage to

6   use the pointer when you're describing where these things are

7   rather than me?

8                MR. ABELN:  Your Honor, with permission, I'd

9   ask the Trooper be allowed to step down and do so.

10               THE COURT:  You may step down.

11               MR. ABELN:  Can the jury see this okay?  Is

12  there anything that I need to do to improve it? Do you have

13  light to see the diagram that I presented to you?  All right.

14  BY MR. ABELN:

15  Q      Proceed, Trooper.

16  A      Route 191 would be down here.  And you have a front

17  parking lot.  Here's the State Police Barracks.  Directly

18  behind the State Police Barracks --

19  Q      Why don't you stand where I am so that the Judge can see

20  also.

21  A      Directly behind the barracks you have the parking lot.

22  The first row of cars right here directly behind the barracks

23  are usually patrol vehicles.

24  Q      Are those vehicles that you've indicated as patrol

25  vehicles what Trooper Golden called blue and whites?

1    A    That's correct.

2         MR. BORDEN:  I'm going to object because I

3    think we're -- it's going to lead to confusion.

4         This photo was not taken until the day after

5    the fire.  Now, unless this witness can testify that's where

6    the vehicles were that night, then I don't want him to say

7    and here's where the patrol vehicles were.

8         I don't mind him pointing out these are patrol

9    vehicles, but this certainly isn't the scene the night of the

10   fire.

11        THE COURT:  You're talking about as far as the

12   patrol vehicles is concerned?

13        MR. BORDEN:  Yes, sir.

14        THE COURT:  All right.  I think everyone

15   understands that.

16        Proceed.

17   A    In addition, the rear part of this parking lot, which

18   would be these vehicles right here, these are also either

19   private vehicles or State Police vehicles.

20   BY MR. AGELN:

21   Q    They also, as Mr. Borden pointed out, may not necessarily

22   all have been there at the time of the fire?

23   A    That's correct.

24   Q    What is the next row after -- I'm sorry.

25   A    From here, going back, you have three rows; and these

1  were all confiscated vehicles in these three rows, first row,

2  second row, third row.

3  Q    Is that an accurate representation of the vehicles, the

4  confiscated vehicles, as you observed it when you went to the

5  Pennsylvania State Police Barracks that particular morning?

6  A    It is.

7  Q    Proceed.

8  A    To the back of these confiscated vehicles is the office

9  trailer that I referred to right here.  The trailer went from

10 this -- approximately this location to alongside the trailer

11 over here.

12 Q    What is -- pardon me. What is the building directly

13 behind the State Police Barracks with the metal roof?

14 A    That's a construction vehicle, and also there's some

15 offices in there.  That's the main building for the property

16 owner, Mr. Swenson.

17 Q    Now, in your diagram, Trooper, which we've marked as

18 Commonwealth's Exhibit No. 18, which you have up there, you

19 had indicated that this was not to scale.  Do you have

20 knowledge from your own personal observation as to how close

21 these vehicles were to each other?

22 A    Yes, I do.

23 Q    What is that, sir?  Could you describe that for the jury

24 please.

25 A    The confiscated vehicles for the most part on an average

1    side by side, were approximately two to four feet distance

2    between them.  Moreover -- they're more like two feet between

3    them, side to side, the vehicles.

4         The distance between the rows, that would be between the

5    three rows here, ranged approximately five feet to ten feet

6    between vehicles.

7         The first row of vehicles here was approximately four to

8    five feet from the row of vehicles that would have been in

9    the parking lot.

10        The distance, approximately, from these vehicles to any

11   vehicle that may have been parked behind the barracks is

12   approximately 30 to 31 feet.

13            MR. BORDEN:  Your Honor, I'm going to object.

14   We're getting into speculation again.

15            I don't mind if the gentleman testifies that

16   from the vehicles that were actually there, that is the

17   confiscated vehicles, to the barracks is X distance because

18   we know that, but we're speculating as to where a vehicle was

19   parked that night, so that --

20            THE COURT:  Overruled.

21   BY MR. ABELN:

22   Q    Go ahead, Trooper.

23   A    The distance from a vehicle parked in this location to

24   the barracks is approximately eight feet.

25            MR. ABELN:  Would you show the next slide,

Noschousky - dire

43a

1    please.

2    BY MR. ABELN:

3    Q    This would be Commonwealth's Exhibit No. 2.  What does

4    that represent?

5    A    That would be looking from the rear part of the barracks

6    towards Route 191.

7    Q    The opposite direction from the last photo?

8    A    The opposite from the last photo.

9    Q    Does that photograph, again, accurately represent the

10   vehicles as they were situated on the morning of September 25t

11   1984?

12   A    Confiscated vehicles, the trailer, and the truck, yes.

13   Q    From this overhead view, Trooper, can you point out to

14   the jury where the fire trail is located and how it's similar

15   to your particular diagram?

16   A    It ran from approximately this location here alongside

17   the office trailer down to the center rear of this vehicle,

18   which was the Cadillac, and then, of course, it went in that

19   direction, and then down through the vehicles to where it

20   connected to ten vehicles.

21            MR. ABELN:  Next photograph, please.

22   BY MR. ABELN:

23   Q    Commonwealth's Exhibit No. 3.  What scene does that

24   depict, sir?

25   A    That's a close-up shot of the area or the point of orig

1   where the fire would have been ignited.

2   Q     What's the definition of a point of origin?

3   A     That's where the fire originates or starts.

4   Q     How did you come to that conclusion?

5   A     The target would have been these vehicles.  That's where

6   the multiple trails went.  The single trail went from this

7   vehicle back to this point here.

8         The purpose would have been to ignite the flammable

9   liquid at this point so that you wouldn't be in -- so that the

10  person would not be in this area.  The fire would then travel

11  that's why it's called fire trail  -- the fire would then travel

12  this flammable liquid to the point where it met the other

13  connections of the flammable liquid and would have just kept

14  burning until it did the purpose that it was designed to do.

15  Q     Is that dark spot that you show that's seen leading to

16  the Cadillac an accurate description of the fire trail to

17  which you have just discussed?

18  A     Yes, it is.  It also reveals that this did burn, and this

19  is where the book of matches was found.  Roughly under this

20  area of the trailer is where the plastic container was found.

21  Q     Now, on the side of the trailer, was there any damage

22  to this particular trailer?

23  A     Monetary damage, I would say no, but you could see where

24  there was some sooting and some char markings on the trailer.

25  Q     Now, were you able to find the source of ignition to thi

1  particular fire?

2  A     My opinion, the source of ignition was the pack of

3  matches that I found approximately right in this area in the

4  flammable liquid pour.

5  Q     I'm going to show you what I've marked as Commonwealth's

6  Exhibit No. 16.

7        You can put the pictures down.  I'll ask you to open

8  that carefully and take a look at it, please, and identify it,

9  if you will.

10  A     [Witness complies.]  That's the burnt pack of matches

11  that I found in the flammable liquid trail.

12  Q     What is the significance of the matches, Trooper?

13  A     It indicates a source of ignition.

14  Q     Are there any times when, in your professional opinion,

15  that matches could be used as a timing device?

16  A     Yes, they could be.

17  Q     Would you explain that to the jury, what possible ways

18  could matches be used as a timing device, and what does a

19  timing device mean?

20  A     One common method of using matches as a timing device

21  would be to place a cigarette in the match pack, and then it

22  allows whoever places it there enough time to get away from

23  the area and possibly establish an alibi or what have you.

24  That would be the purpose of a timing device, and that would

25  also be one way that matches could be set up as a timing device

1    Q    Is there any other ways?

2    A    Not if you're talking about a flammable liquid being used.

3    Q    Now, based upon your observation of the entire amount of

4    the cars and the fire lines that went out from the cars, what

5    is the actual significance of that line that leads to the

6    Cadillac?

7    A    As a trailing device?

8    Q    Yes.  Would you explain that, please.

9    A    The actual significance, as I mentioned, would be for

10   whoever would want to do this to be away from the major area

11   where the fire would finally erupt at the time after ignition.

12   Q    Dealing with the matches, do you have an opinion as to

13   how the fire was started, based upon the evidence in that

14   particular scene where you gathered the evidence?

15   A    Well, the matches, obviously, ignited and put -- and

16   placed in the flammable liquid area so that it would trail

17   down to the cars.  So it was either one match or the whole

18   pack of matches was either ignited and placed in the trail,

19   which ignited the flammable liquid, giving the person enough

20   time to get away before it finally got down to where the

21   vehicles are.

22   Q    Where did the fire trail go after it left the Cadillac?

23   And may I ask you another question before you answer that, sir?

24   What is the significance of the license plate on the Cadillac?

25   A    The significance of the license plate is, like I

1    explained earlier, if you see right here there's a white

2    wool-type rag coming out of the gasoline fill pipe, which is

3    right behind the license plate.

4                    MR. ABELN:  Could I have photo No. 4, please?

5    BY MR. ABELN:

6    Q      What is that, sir?

7    A      That's a close-up of the back of the vehicle, shows the

8    wool rag coming out of the gasoline tank.

9    Q      Did you observe by touching or smelling that particular

10   rag?

11   A      Yes, I did.

12   Q      What did you in your opinion feel that was composed of?

13   A      The rag along with the rest of them, and the flammable

14   liquid pour, in my opinion, had somewhat of an odor of

15   gasoline, but it had an odor of gasoline, but yet you could

16   tell that it was either weathered gasoline or something was

17   with it because it didn't have a pure smell to it.  Somewhat

18   of a --

19                   MR. BORDEN:  Excuse me. Don't we have a

20   laboratory report that says it's gasoline?

21                   MR. ABELN:  We do.

22                   Your Honor, at this time I'd ask that I'd be

23   allowed to read stipulation No. 1 to the jury.

24                   "It is hereby stipulated and agreed among the

25   parties that if Thomas A. Mackowitz were called as a witness,

1  he would testify that he is a Criminalist 2 employed by the

2  laboratory division of the Pennsylvania State Police.  He

3  would testify that he analyzed evidence samples that were

4  given to him by Trooper Walter Moschowsky, Pennsylvania State

5  Police Fire Marshal, on September 27, 1984.  He would testify

6  that the samples were several saturated T-shirts, rags, and

7  a plastic bag, grass and dirt debris from the ground, taken

8  from the fire trail, and a small sample of liquid taken from

9  a one gallon metal can.  He would testify that the substance

10 was gasoline.

11          "He would also testify that he tested other

12 T-shirts or rags and a saturated curtain from the interior of

13 the defendant's Ford Bronco, and these items were shown to

14 contain a volatile substance.

15          "He would further testify that he tested a

16 small control sample of Bondo Fiberglass resin and determined

17 it also to be a volatile substance."

18          Thank you, your Honor.

19          THE COURT:  All right.  The same instruction

20 as the last stipulation, that is an agreement between counsel,

21 and that is to be considered a proven fact.  And I think it's

22 an appropriate time that we break for the evening, and we'll

23 see you back here at nine o'clock tomorrow morning.  Have a

24 good evening, and remember it's very important that you do

25 not discuss this case amongst yourselves or with anyone else

1   until all of the evidence is in as being fair to both parties.

2           Your schedule tomorrow is going to be nine

3   o'clock.  We're going to break around noontime.  I have

4   another matter at one o'clock, so we're going to see you in

5   the afternoon.  It's going to be 1:30 to 4:30.

6           And what else?  I guess this case will recess

7   until nine o'clock.

8           MR. BORDEN:  Hand the sheets in, your Honor?

9           THE COURT:  Yes, please.  And I guess I have

10  a bail reduction hearing at 8:30.

11          Anything else, gentlemen?

12          MR. BORDEN:  No, sir.

13          THE COURT:  Have a good evening, everyone.

14          REINHARD WAGNER, COURT CRIER:  Court will

15  adjourn till 8:30.  Jury will be here at nine.

16          [Court recessed for the day.]

17                  ---

18          THE COURT:  Good morning.

19          MR. ABELN:  Good morning.

20          MR. BORDEN:  Good morning.

21          THE COURT:  We have the members of the jury,

22  counsel for both sides.

23          Proceed.

24          MR. ABELN:  Your Honor, with the Court's

25  permission, I'd like to distribute the chart that was prepared

1  by Mr. Moschowsky to the jury.

2          Good morning, ladies and gentlemen.

3          Recall Trooper Moschowsky.

4                          ---

5          TROOPER WALTER MOSCHOWSKY, recalled, having

6  been previously duly sworn, was examined and testified as

7  follows:

8          MR. ABELN:  Trooper, instead of taking the

9  stand, I'd ask you to return to the screen, and I'll give you

10 the pointer that I had; and here, sir, are the pictures that

11 we've marked as exhibits.

12          THE COURT:  Want to hit the lights?

13          MR. ABELN:  I wonder if you could keep that

14 front light on?

15          MR. BORDEN:  I can't see the ground.

16          MR. ABELN:  You have to turn it off.

17 BY MR. ABELN:

18 Q    Trooper Moschowsky, I'll remind you that you're still

19 under oath to tell the truth, and I believe we left off

20 yesterday in photo -- in Commonwealth's Exhibit No. 4.

21          MR. ABELN:  Let's go to the next slide.

22 BY MR. ABELN:

23 Q    Trooper, what, if anything, was found by this particular

24 Cadillac?

25 A    Right below the left door is where that one gallon

1    Bondo can was located, right here in the trail.

2              MR. ABELN:  Go to the next photo, please.

3    BY MR. ABELN:

4    Q    What does this photo represent?  This is Commonwealth's

5    Exhibit No. 6.

6    A    This truck here is vehicle 26 on the diagram, which

7    would be the left side of the Cadillac.  It indicates that the

8    trail came from the direction of the Cadillac back behind his

9    vehicle, down alongside and in between those two trucks there.

10   Q    What is the vehicle that's directly in front of that

11   particular truck?

12   A    That would be vehicle No. 14 on the diagram.  That's

13   the one that received the most damage.

14   Q    Did you find out through your investigation who that

15   truck belonged to?

16   A    Yes, I did.

17   Q    Who was that?

18   A    The defendant.

19             MR. ABELN:  Go ahead to the next photograph.

20   BY MR. ABELN:

21   Q    What is the significance of that picture?

22   A    That's the same vehicle, showing the close-up of the

23   rag coming out of the gasoline tank.

24   Q    Does it exhibit a fire trail?

25   A    It also has a trail going along the left side of it.

1          MR. ABELN:   Next, please.

2     BY MR. ABELN:

3     Q     Commonwealth's Exhibit No. 9.

4     A     That's vehicle No. 29 on the diagram, which would be to

5     the left of the previous vehicle that was just shown.  It also

6     shows a flammable liquid trail alongside, which also indicates

7     that it was burning, and also the rag coming out of the

8     gasoline tank.

9          MR. ABELN:   Go to the next one.

10    A     That's the same vehicle, looking at it from the front

11    towards the back, the trail going alongside of it, and the

12    rag coming out of the gasoline tank.

13         MR. ABELN:   Go to the next picture, please.

14    BY MR. ABELN:

15    Q     This, I believe, is Commonwealth's Exhibit No. 8.  Is

16    that correct?

17    A     Ten.

18    Q     Ten?  Sorry.

19    A     This is Exhibit 10.  This would be vehicle No. 15 on

20    the diagram, which would have been directly in front of the

21    Cadillac, and directly to the right of vehicle 14, the

22    defendant's vehicle.  This also reveals the rag coming out of

23    the gasoline tank, the flammable liquid pattern on the ground.

24         MR. ABELN:   Go to the next picture.

25    BY MR. ABELN:

1   Q      Now, what does this picture represent?  This is B.

2   A      This is the back end of vehicle No. 14 on the diagram,

3   which would have been the defendant's vehicle.  It indicates

4   a flammable liquid pattern behind -- this particular photograph

5   or slide shows the flammable liquid behind the vehicle.

6   Q      Is that Commonwealth's Exhibit No. 12, sir?

7   A      Eleven.

8   Q      Eleven.  That's right.

9            MR. ABELN:  Go to the -- Commonwealth's Exhibit

10  No. 12.

11  A      That's the same vehicle.  This shows the amount of fire

12  damage in and around the gasoline tank coming up the side, and

13  the flammable liquid trail on the ground.

14         This particular vehicle here I wasn't able to get the rag

15  from the gasoline tank because it had been consumed, and it was

16  just charred remains, and as soon as I touched it what was left

17  here fell into the gasoline tank and the rest fell on the

18  ground, and it was just all charred up.

19            MR. BORDEN:  What vehicle number was that, sir?

20            MR. ABELN:  Fourteen on the chart.  Commonwealth

21  Exhibit No. 12.

22  BY MR. ABELN:

23  Q      Did you have an opportunity to take a look at that vehicle

24  in detail, Trooper?

25  A      Yes, I did.

1  Q    Would you tell the jury what you observed in addition

2  to that --

3  A    In addition to what I mentioned here already, this

4  vehicle here had the left rear side window open, and this is

5  the one that had the curtains inside.  This vehicle is also

6  the one that appeared to have a flammable liquid poured also

7  on the inside of it.

8  Q    Was that one of the curtains that was submitted to the

9  chemist that we stipulated to yesterday as containing a

10  volatile substance?

11  A    That's correct.

12  Q    What's the significance of a window being open?

13  A    Well, one of the significances would have been had the

14  flammable liquid caught fire inside the open window would have

15  supplied enough oxygen to sustain combustion.

16  Q    Do you know the condition of the door when you arrived?

17  A    I believe the door was shut.

18  Q    Was it locked or unlocked?

19  A    I'm not sure about that.

20  Q    Now, the vehicle that was directly next to this

21  particular vehicle, which would be vehicle 13 on your chart,

22  in your diagram you have a little mark on the bottom of

23  vehicle No. 13.  Would you tell the jury what the significance

24  of that is.

25  A    Do you want to go to the next slide?  The next slide is

1  vehicle No. 13.

2          MR. ABELN:  Go ahead.

3  A    This is vehicle No. 13 on the chart.  Exhibit 13, also.

4          The significance of this vehicle, this one here would

5  have been to the left side of the defendant's vehicle.  It had

6  the flammable liquid trail on the ground.

7          Now, this particular vehicle had a plastic bag as a wick

8  coming out of the gasoline tank.  Further, this here particula

9  vehicle is the one that I found the other one gallon Bondo can

10 in the back end of this truck, this vehicle.

11         MR. ABELN:  Did you see these?

12         MR. BORDEN:  I sure have.

13 BY MR. ABELN:

14 Q    Trooper, I'm going to show you what I've marked as

15 Commonwealth's Exhibit No. 17 and Commonwealth's Exhibit No. 1

16 and ask you to identify those, please.

17 A    Seventeen is the can that I found the flammable liquid

18 trail on the ground alongside the Cadillac.  Nineteen is the

19 can that I found in the back of this vehicle here.

20 Q    Was that the vehicle next to the defendant's vehicle?

21 A    Yes, it is -- was.

22         MR. ABELN:  Go to the next exhibit.

23 BY MR. ABELN:

24 Q    This would be Commonwealth's Exhibit No. 14.

25 A    This is the same vehicle as the previous slide.  This

1   shows a little more distinctly the flammable liquid pattern on

2   the ground behind the vehicle and then going down the left

3   side of the vehicle.

4           MR. ABELN:  Next exhibit, please.

5   BY MR. ABELN:

6   Q      Now, finally, Trooper, what is Commonwealth's Exhibit

7   No. 15?

8   A      That's another overall aerial shot of the scene, looking

9   from the -- which would have been the right side of the

10  barracks or looking towards Honesdale.

11  Q      Does that represent an accurate description of the

12  vehicles as they were the day that you arrived from that

13  particular point?

14  A      Yes, with regard to the confiscated vehicles, the trailer

15  and these vehicles back in this here area.

16  Q      Does that accurately represent the distances between

17  each vehicle, as well?

18  A      Yes, it does.

19  Q      Trooper, directing your attention to the gas caps that

20  were found at the scene, did anyone make a test for finger-

21  prints of those particular gas caps and the other objects

22  that you had?

23  A      Trooper Francis Zanin of the State Police in Dunmore.

24          MR. ABELN:  Your honor, at this time I'd like

25  to read the final stipulation that counsel and I have entered

1    into.

2              "It's hereby stipulated and agreed among the

3    parties that Trooper Francis E. Zanin [Z-a-n-i-n], a

4    Pennsylvania State Police fingerprint examiner, processed

5    seven gas caps that had been removed from the vehicles, one

6    red plastic antifreeze container, two blue one gallon metal

7    cans, Bondo Fiberglass resin cans, and a partially burnt

8    match book.  He would testify that no fingerprints were found

9    on any of these items, but on one of the metal cans was

10   developed what appeared to be the marking of a design used on

11   Playtex rubber gloves.  On the other can was developed fabric

12   ribbing."

13             THE COURT:  Same instruction as the last two,

14   both counsel have agreed to that stipulation, so you should

15   consider that as a fact.

16   BY MR. ABELN:

17   Q      Trooper, what's the significance of the marking of the

18   design used on Playtex rubber gloves?

19   A      That was obviously an indication that whoever handled

20   these cans at one time wore rubber gloves.

21   Q      What about the term developed fabric ribbing?

22   A      The only significance I can place on that would be the

23   fact that obviously this can was up against some piece of

24   material and it adhered to the can for some reason.

25   Q      Could that have been a cloth glove?

1   A      Any type of material.

2   Q      Could it have been a shirt?

3   A      From the description, I would say yes.

4   Q      When you arrived at the barracks were you able to

5   determine whether or not this particular arson scene had

6   remained intact from the time it had been discovered, or was

7   evidence moved around?

8   A      It was my understanding that everything was as it was at

9   the time of the fire.

10  Q      What was your estimate, based upon your professional

11  opinion, of the time that this fire actually occurred?

12  A      I estimated the time of the fire was between midnight

13  and 7:30 a.m.

14  Q      Were you able to determine the maximum amount of time

15  the fire actually burned from the minimum to a maximum?

16  A      It was my opinion that I would say the fire probably

17  burned, from the amount of damage, maybe possibly for around

18  20 minutes.

19  Q      How would you describe this fire in terms of definition?

20  A      My conclusion upon the investigation was that this fire

21  was of incendiary origin.

22  Q      Now, do you have an opinion as to where the gasoline can

23  came from that was used to start this fire?

24  A      The gasoline can?

25  Q      No, the gasoline came from.  Did I say can?  I'm sorry.

1    Where the gasoline came from that was used to start the

2    fire, based upon the evidence that you saw.

3    A    It would be my opinion that the gasoline could have

4    either been brought to the scene or could have been acquired

5    from possibly that dump truck at the scene already.  However,

6    I believe that the gasoline was probably carried amongst the

7    vehicles in either one or both of these two cans, as well as

8.   the plastic container I had mentioned earlier that was found

9    alongside of the trailer -- office trailer.

10   Q    Now, Trooper, would you describe the building of the

11   Pennsylvania State Police Barracks from the rear side of this

12   particular building?

13   A    The building is mainly brick veneer.  The gables are

14   wood frame constructed, and the roof is an asphalt shingle

15   construction.

16   Q    Is there anything flammable located by the entrance?

17   And where is the entrance on this particular slide?

18   A    The entrance is right at this location here.  The door

19   is a complete glass-type door.  To the right of the entrance

20   there are two propane -- large propane tanks or containers.

21            MR. BORDEN:  Excuse me.  Is this as of that

22   date?

23            MR. ABELN:  [Nodding affirmatively.]

24   BY MR. ABELN:

25   Q    You state in your opinion that this fire was of

1  incendiary origin and it was an arson.  What was the intent

2  of this arson, in your opinion?

3  A    The fact that the nucleus or center of those vehicles

4  was physically trailed with a flammable liquid, it's my opinion

5  that the intent was to completely destroy all of those vehicles

6  Q    Now, only 10 of the 31 actually had wicks in it and fire

7  trails to it. Is that correct?

8  A    That's correct.

9  Q    If the 10 vehicles that the fire trails led to had

10 caught on fire completely, what would have happened to the

11 other 21 vehicles?

12           MR. BORDEN:  Objection.  Basis of the objection

13 is it calls for a hypothetical.  You have a hypothetical

14 question, it is necessary that there be facts in evidence.

15           There has been no evidence presented to this

16 point or an offer of proof that those vehicles caught fire,

17 would have, or could have caught fire.  As a result, the

18 hypothetical question is improper.

19           THE COURT:  Overruled.

20           Answer the question.

21 BY MR. ABELN:

22 Q    Answer the question.

23 A    Would you rephrase the question again?

24           MR. ABELN:  Would you repeat, please?

25           [The following question was read by the reporter

Moschousky - dir                          61a

"Q     If the 10 vehicles that the fire trails led to had
caught on fire completely, what would have happened to the
other 21 vehicles?"]

A      Because of the close proximity of all the vehicles that
were parked there, there's no doubt in my mind that if not all
the majority of them eventually would have caught fire.

BY MR. ABELN:

Q      Directing your attention to the vehicles that are parked
in front, those are not necessarily the vehicles that were
there at the day of the fire.

A      That's correct.

Q      If there had been vehicles parked there, in your opinion
what would have happened to them had all 31 cars gone up in
flames?

           MR. BORDEN:  Objection.  Same objection I
registered before.  In addition, I would say it calls for
speculation.

           THE COURT:  Sustained.

BY MR. ABELN:

Q      Do you have an opinion, Trooper Moschousky, as to why
only 10 of the vehicles were targeted by this arsonist?

A      My opinion is probably for a couple of reasons:  One is
that trailing the nucleus of all of these vehicles would have
been sufficient.  There would have been no reason to have to
trail all of them.

1    Secondly, to trail all of them would require, number one,

2 more flammable liquid; and number two, the possibility of

3 being observed or detected would be there because you'd have

4 to be there for a longer period of time by the time you

5 trailed all those vehicles.

6 Q    Did you actually walk behind the vehicles and between

7 the trailer that's exhibited on this photograph?

8 A    The office trailer?

9 Q    Right.

10 A    I walked all this area here, along here, all the way

11 around this building here, this entire area.

12 Q    Between the trailer and the vehicles, are you able to

13 see the State Police Barracks if you're kneeling down?

14 A    This location?

15 Q    Right.

16 A    If you were kneeling down, could you see the State Police

17 Barracks?

18 Q    Yes.

19 A    I'd say you probably could see at least the roof, if

20 nothing else.

21 Q    Now, you had testified as to the condition of the

22 defendant's vehicle, the Bronco, in this case.  Do you have an

23 opinion as to that particular vehicle and its role in this

24 arson?

25 A    Just from what the evidence revealed, for some reason

1  that particular vehicle was targeted more than any of the

2  other vehicles in that there was flammable liquid placed

3  inside of it as well as around it and alongside of it.

4  Q    Now, Trooper, through your training and experience, is

5  there any significant difference between a vehicle fire of a

6  vehicle with the gas cap on as opposed to a vehicle fire with

7  the gas cap off?

8          MR. BORDEN:  I'm going to object.  I believe

9  that the testimony has indicated that all of the targeted

10  vehicles had the gas caps removed.  Therefore, I don't even

11  see how it's relevant, sir.

12          THE COURT:  Overruled.  There's also testimony

13  that the rest had the gas caps on, and that all or some of

14  them could have gone up.

15          Answer the question.

16  A    The significance there is, as I already pointed out,

17  some vehicles did have caps on, but 10 did not.

18      With the cap on the gas tank there is more possibility

19  of an explosion taking place of the gasoline tank, itself.

20  BY MR. ABELN:

21  Q    Trooper, in your experience as an arson investigator

22  and through your training, have you ever seen the results of

23  a closed or sealed gas container after it had been involved

24  in a fire?

25  A    I have.

1  Q    What is that?  Could you describe that to the jury?

2  A    I've observed cans in structure fires with gas -- that

3  had gasoline in them.  With the cap on the gasoline can, what

4  would happen was the can would either shatter like a piece of

5  shrapnel or else it would just completely bulge right out,

6  whereas the cans without any caps on them revealed very little

7  or no damage at all to them.

8  Q    Trooper, if all 31 of these vehicles had gone up in

9  flames or exploded, in your professional opinion, had there

10  been someone in close proximity to the fire, what would have

11  been the result to that particular person?

12          MR. BORDEN:  Objection, sir.  Same basis.

13  Hypothetical question.  There's been no evidence whatsoever

14  that any of these vehicles would have gone up, and without that

15  basis we don't see how he can answer that question.

16          THE COURT:  Overruled.

17  A    It's my opinion that had all or the majority of them

18  vehicles been engulfed in fire as the intent was so designed,

19  that anyone within a close proximity of that area could have

20  seriously been injured.

21  BY MR. ABELN:

22  Q    In your professional opinion, what would be the risk

23  danger to the Pennsylvania State Police Barracks as indicated

24  in this particular photograph had all of those vehicles ignited

25  and gone up in flames or exploded?

1          MR. BORDEN:  Please note the same objection.

2    A     Same as I said about the person.  Had all or the

3    majority of these vehicles been engulfed in flames, that would

4    have been somewhat of a major fire, especially with all the

5    flammable liquid that was present, at which time, again,

6    there's no doubt in my mind that the State Police Barracks,

7    as well as this office trailer over here, could have been

8    damaged.

9          MR. ABELN:  Cross-examine.

10          THE COURT:  Take the stand.

11          THE WITNESS:  [Witness complies.]

12                    CROSS-EXAMINATION

13   BY MR. BORDEN:

14   Q     Trooper Moschowsky, as I understand your testimony, you

15   arrived at the scene on the morning of September 25th.  Is

16   that correct?

17   A     That's correct.

18   Q     When you arrived at the scene the scene was basically

19   intact from the fire scene that was reported.  Is that correct?

20   A     That's correct.

21   Q     I want to make sure that this jury understands the scene.

22   What I'm going to do, I'm going to draw the State Police

23   Barracks, recognizing nothing is to scale, and I want you to

24   describe that building for the jury. What's it made out of?

25   A     It's a brick veneer building.

1    Q    When you say veneer --

2    A    Outside of the building is brick.

3    Q    So the side that would be facing the cars, if the cars

4    were down here, is made of brick.  Is that accurate?

5    A    To a point that's correct.  The majority of that side

6    facing the fire would have been brick or was brick.

7    Q    What was the roof made of, sir?

8    A    The roof was asphalt, shingling, and the gable over the

9    doorway, which would also have been facing the cars, was wood

10   constructed.

11   Q    Would you agree with me that this building was fairly new

12   A    Correct.

13   Q    The building was less than ten years old?

14   A    I'm not exactly sure when it was built.  I'd say probably

15   around that time.

16   Q    How many entrances are there to that building, sir?

17   A    I believe four.

18   Q    Can you tell us where they are?

19   A    One would be, as you're looking at the building, it would

20   be on the rear side to the left.

21   Q    Here, sir?

22                MR. ABELN:  Your Honor, if I may interrupt and

23   make an objection, I'd like to ask counsel if I could give

24   these photographs to the Trooper, so he could be accurate in

25   his description of the building?

1       MR. BORDEN:  If he can't remember, then I would

2   agree to that, but if the man has testified that he's familiar

3   with the scene --

4       MR. ABELN:  I understand.

5   BY MR. BORDEN:

6   Q    Here, sir?

7   A    Indicating the top of where you have your hand now, let's

8   assume that's the front of the building.

9   Q    Correct.  The road will be the top of the blackboard.

10  A    There is one door right there.  I believe that's for the

11  driver examiner's unit.  On the left side would have been, I

12  believe, overhead doors or some sort of a door.

13  Q    Here, sir?

14  A    Some place on the side.  To the back --

15  Q    Here?

16  A    Right about there would have been the glass door I

17  described or the entrance into the parking lot.  And on the

18  right, I'd say probably about the middle of the building is --

19  I believe that's the main entrance.

20  Q    So there are four entrances to this building, correct?

21  A    I believe so, yes.

22  Q    Is the barracks equipped with a sprinkler system?

23  A    It's my understanding it's not.

24  Q    Is the barracks equipped with smoke detectors?

25  A    As far as -- again, it's my understanding that the

1    building doesn't have any smoke detectors.

2    Q    As part of --

3    A    I don't know definitely, but I believe that.

4    Q    As part of your investigation, making a determination as

5    to whether this building would catch on fire, did you check

6    to see if they had a sprinkler system?

7    A    The building, itself, wasn't involved in the fire at the

8    time, so there would be no reason.

9    Q    That's my point.  You didn't check to see if there was a

10   sprinkler system, did you?

11   A    I had asked, and the party I asked told me that there

12   wasn't.

13   Q    I don't want to get involved in a semantical problem

14   here.  My question is did you inspect the building to see if

15   there was a sprinkler system?

16   A    Physically inspect it, no.

17   Q    Did you physically inspect the building to see if there

18   was a smoke detector system?

19   A    No.

20   Q    Did you physically inspect the building to see if there

21   were any fire extinguishers and where they were located?

22   A    I know there are fire extinguishers, but I don't know

23   exactly where they're located in the building.

24   Q    So you do know that there are fire extinguishers?

25   A    That's correct.

1    Q    Now, from your investigation, there was no accelerant

2    or fire trail around this building, was there?

3    A    That's correct.

4    Q    Immediately adjacent to the barracks is a parking lot,

5    is there not?

6    A    In the rear.  That's correct.

7    Q    Would you tell the jury what that parking lot is made

8    out of?

9    A    Macadam, blacktop.

10   Q    Did your investigation indicate there was any accelerant

11   or flammable liquid placed in the parking lot area?

12   A    I didn't detect any, no.

13   Q    Would you tell the jury the length of the parking lot,

14   that is the distance between the building and the end of the

15   macadam?

16   A    Approximately 50 feet.

17   Q    Next to the parking lot is a field area.  Is that correct

18   A    To the rear of the parking lot, that's correct.

19   Q    That's where these confiscated automobiles were parked.

20   Is that correct?

21   A    That's correct.

22   Q    I believe that you testified they were parked in three

23   rows.  Is that accurate?

24   A    That's correct.

25   Q    The X's on the blackboard are going to represent the

1  first row of vehicles.  Was there any accelerant placed between

2  the end of the macadam and the first row of vehicles?

3  A    No.

4  Q    Can you give me the distance between the end of the

5  macadam and the bumper of the first vehicle?

6  A    Approximately four to five feet.

7  Q    Then we have a second row of vehicles.  Is that accurate

8  sir?

9  A    That's correct.

10  Q    Was there any accelerant placed in this area, that is

11  the row between the first and second vehicles?

12  A    Not that I detected, no.

13  Q    It's only when we hit the second row of vehicles that we

14  run into the fire trails that you've described for us.  Is

15  that accurate?

16  A    That's correct.

17  Q    Can you give me the distance between the first row and

18  the second row of vehicles, approximately?

19  A    I believe between seven, nine feet.

20  Q    Eight?  Would that be a fair --

21  A    Eight.  About eight feet.

22  Q    On the map that you provided to the jury, if we would

23  call this vehicle 13, 14, et cetera, et cetera, can you give

24  me the distance from vehicle 14 to the barracks?

25  A    Approximately 60, 65 feet.

1    Q      If I told you --

2    A      I'd say even a little more than that. Let's see, 50 --

3 probably between 70 and 75 feet.

4    Q      You're saying the distance from here to here is 75 feet?

5    A      Approximately. Maybe a little more.

6    Q      If I told you it was over a hundred feet, would you

7 disagree with me?

8    A      I don't know if I'd disagree with you. I'd have to sit

9 down and actually calculate the length of the cars and every-

10 thing else. Seventy-five to a hundred feet? I'd say 75 feet

11 or more. I'm not saying you're wrong at a hundred feet, no.

12    Q      If I told you the exact distance was 104 feet, would you

13 agree with me?

14            MR. ABELN: He already answered the question.

15 Your Honor, I object.

16 BY MR. BORDEN:

17    Q      A hundred and four feet to the building?

18            THE COURT: Sustained.

19    A      I wouldn't disagree.

20 BY MR. BORDEN:

21    Q      When you went out there and conducted your investigation,

22 did you do these measurements?

23    A      At that time?

24    Q      Yes.

25    A      No.

1   Q    The reason you didn't conduct any measurements at that

2   time is because you felt that there was really no threat to

3   the barracks whatsoever and there was no need to do any of

4   these measurements, isn't that correct?

5   A    That's not correct.

6   Q    Have you subsequently done measurements?

7   A    Yes.

8   Q    When?

9   A    The other day.  Two days ago.

10  Q    Two days ago?  That's the first time that you did

11  measurements?

12  A    With a tape measure.  I approximated prior to that.

13  Q    Am I correct that this fire occurred in September of 1984

14  September 25th?

15  A    That's correct.

16  Q    And today's date is September 16, 1986?

17  A    That's correct.

18  Q    So it wasn't until almost two years after this fire that

19  you went back and did these measurements?  Is that accurate?

20  A    With a tape measure.

21  Q    Right.  Is that correct?

22  A    It's accurate.  With a tape measure, that's correct.

23  Q    You went back, and you did it with a tape measure two

24  years later, and it's your testimony you're not sure what this

25  distance is?

1  A    I could sit down, I could right now figure it out and
2  tell you approximately what the distance is.
3  Q    When you measured it with the tape did you write it
4  down, sir?
5  A    I didn't give a total distance.  I did write it down.
6        I can add them up -- I measured from the building to
7  the first row of cars, and from those vehicles across the
8  macadam, then to the vehicles, the private vehicles, that would
9  have been at the edge of the macadam.  I measured from there
10 to the first row of vehicles, and then between the rows of
11 vehicles.  I did not take one complete measurement from the
12 barracks to any particular vehicle within that group of
13 vehicles.
14 Q    I'm going to put in a third row of cars.  It is this
15 area in here where you began to discover a fire trail, is that
16 accurate, behind this second row?
17 A    That's correct, and also alongside leading to the front
18 of those vehicles.
19 Q    I want the jury to get a perspective of distance.  From
20 that wall to that wall, if I told you it was 50 feet, would you
21 disagree with me?
22 A    No.
23 Q    So if that were the back of the barracks, according to
24 your testimony, this entire thing would be macadam parking lot.
25 Is that accurate?

1    A    Not quite.

2    Q    How is it inaccurate, sir?

3    A    You're estimating the distance from the building to the

4    edge of the macadam.

5    Q    Correct.

6    A    The macadam does not go right to the building.

7    Q    How far away does it go?

8    A    I'd say within eight feet of the building.

9    Q    If the wall were the barracks, there would be a space of

10   eight feet and then the parking lot would start, and we would

11   keep walking, correct?

12   A    That's correct.

13   Q    To the end of the parking lot, which would be that wall.

14   Is that accurate?

15   A    Correct.

16   Q    If the second row of cars where the fire trails were

17   were a hundred feet, it would be twice the length of this room

18   where that fire would be.  Is that correct?

19   A    That's correct.

20   Q    You came up with a map that the jury now has in their

21   hands.  Is that accurate?

22   A    Rough sketch.  That's correct.

23   Q    That's not to scale?

24   A    No, it's not.

25   Q    The distances between the cars -- have you got your map

1    there?

2    A    Yes, I do.

3    Q    The distances between the cars 13, 14, 15, about, I

4    think that you testified, and correct me if I'm wrong, is

5    about four feet?

6    A    Two to four feet.

7    Q    Two to four feet?  If you take a ruler and you put it

8    and you measure it the distance between the cars, what it

9    actually comes up to, comes to about a quarter of an inch on

10   your map, and I'm going to give you a ruler so you have the

11   opportunity to check to make sure that's correct.

12   A    Pretty close.  A little bigger.

13   Q    It is a little bigger, but I'm going to go with a

14   quarter of an inch.

15        If a quarter of an inch is approximately four feet, an

16   inch is 16 feet.  Do you agree with me?

17   A    I'd agree.

18   Q    If I take your map and I measure off a hundred feet from

19   the second row, and you can feel free to do so, it comes out

20   to six and a half inches.

21        To make your map in somewhat -- some degree of

22   perspective, the State Police barracks is not down here, but

23   is up here.  Is that accurate?  Feel free to measure it.

24   A    Looking at what you're trying to say there, I mean,

25   that's possible.  That's possible.  Everything is smaller.

1   Nothing is to scale.  I have the rows exactly even, which they

2   weren't.  I have the cars -- if you look at this, the cars are

3   really further apart than it would give the impression.

4        Like I say, it's just a rough scale.  It's not drawn to

5   scale.  It's just a rough sketch.  I did not draw it to scale.

6   Q    My point, Trooper, is that where you indicate the police

7   State Police building -- the barracks -- the distance, the

8   actual distance is at least one and a half times the size of

9   this room, if not over twice the size of this room.  Is that

10  correct, sir?

11  A    That's correct.  On a rough sketch drawing, I'd say

12  probably the barracks should have been probably about the top

13  of the paper there.

14  Q    Now, you testified about cars being in the parking lot

15  area.  That's cars that were parked during the evening and

16  morning hours, I think you testified to marked vehicles,

17  things like this?

18  A    That's correct.

19  Q    Yet I look at your diagram, and none of those cars

20  appear.  Is that accurate?

21  A    That's correct.

22  Q    Once again, isn't the reason that you didn't put any of

23  these cars in here is because when you examined the fire you

24  didn't view that they were in any danger either?  Isn't that

25  true?

1   A    No, that's not true.  I just didn't put them on there.

2   Q    Just didn't put them on?

3   A    One of the reasons I didn't put them on there, to be

4   accurate, is because I don't know what particular vehicles were

5   there at the time of the fire.

6   Q    Exactly.  You were testifying in this case about the

7   spread of a fire, and yet you don't even know what vehicles

8   were located in that parking lot on that night.  Isn't that

9   true, Trooper?

10  A    I don't know which ones.  I know there were vehicles

11  there, though.

12  Q    You don't know how many?

13  A    I don't know how many.

14  Q    You don't know how much gas was in their tanks?

15  A    No.

16  Q    You don't know if the windows were open or closed?

17  A    I can assume they were closed.

18  Q    You can assume all you want, sir.  You didn't make any

19  determination as to what vehicles were located behind that

20  barracks that particular night, isn't that correct?

21  A    That's correct.

22  Q    At the scene the next morning you discovered various

23  rags and shirts.  Is that correct?

24  A    That's correct.

25  Q    Would you describe those for the jury?

FORM OR 325   REPORTERS PAPER & MFG. CO.   1-826-6313

1    A     In detail?

2    Q     Yes, sir.

3    A     I'll have to refer to my report.

4    Q     Feel free.

5          Let me make it easier for you --

6    A     The vehicle that --

7    Q     I'm sorry.

8    A     I have it marked.  The vehicle No. 15 had a green cotton

9    pullover shirt, three button, open collar, short sleeves, the

10   name, quote, Cross Creek, end quote, on the neck tag along with

11   the size medium.

12   Q     Okay.

13   A     Vehicle No. 25, a blue terrycloth pullover shirt, open

14   neck, short sleeve, two front pockets with buttons, the name,

15   quote, Mister Man, end quote, on the neck lable along with the

16   size large.

17         Vehicle 26, a maroon T-shirt with the yellow name Ward

18   Law on the front across the chest and a number 798 in maroon

19   with a yellow oval background on the lower front.

20         On vehicle No. 27 there was a greyish white and green

21   wool-type rag.

22   Q     Thank you.  So how many rags or shirts were there all

23   together, sir?

24   A     Three shirt rags, one unknown type of a grayish white

25   rag, one plastic bag, and one that was unknown.

1    Q    In addition, you testified to the fact that you found

2    some cans at the scene. Is that correct?

3    A    That's correct.

4    Q    These two Bondo cans were located at the scene?

5    A    That's correct.

6    Q    You found another can, didn't you?

7    A    A plastic container.

8    Q    Right.

9                 MR. BORDEN:  Do you happen to have that

10   container?

11                MR. ABELN:  I should.  Downstairs?  Do you

12   want it?

13                MR. BORDEN:  Yes, please.

14                MR. ABELN:  It should have been there.

15                MR. BORDEN:  I'll see if I can go onto something

16   else and come back, sir.

17   BY MR. BORDEN:

18   Q    In addition to the Bondo cans, the rags, the shirt, and

19   a Dow can we're all going to see in a minute, you found some

20   matches.  Is that accurate?

21   A    That's correct.

22   Q    What was written on those matches?

23   A    Weis Markets.

24   Q    Now, you submitted some of these items for laboratory

25   analysis, did you not?

1   A      That's correct.

2   Q      That's part of the stipulation that we heard in court

3   about what the results of that laboratory analysis was.  Is

4   that accurate, sir?

5   A      That's correct.

6   Q      One of the things that you submitted as laboratory

7   analysis was liquid that you found in one of these cans.  Is

8   that true?

9   A      In that particular can.

10  Q      In this particular can?

11  A      That's correct.

12  Q      Was this can empty when you found it?

13  A      No, it wasn't.

14  Q      You didn't submit a sample of this?

15  A      The liquid in that can just appeared to be a heavy

16  syrupy type liquid, which appeared to be the actual product of

17  that can, which would have been a resin.  This particular can

18  had more of a flow type liquid, and the odor, a distinctive

19  odor of something similar to gasoline.

20  Q      The test results indicate that there was gasoline in

21  this can?

22                  MR. ABELN:  That was stipulated to, your Honor.

23                  MR. BORDEN:  Thank you, Mr. Abeln.

24  BY MR. BORDEN:

25  Q      There was gasoline in this can?

Moschowsky - cross                                81a

1   A      It was either -- the fact that the report says volatile

2   substance of gasoline, I'd have to look.

3   Q      It was stipulated that gasoline was, in fact, found in

4   this can.

5   A      Yes, it was.

6   Q      Can you tell the jury why you didn't take a sample of

7   this can and submit it to the crime lab as well?

8   A      I just didn't do it.  I didn't feel any purpose to it.

9   Q      Just didn't do it?

10  A      I felt that what was in that can was what was written

11  on it.  It even smelled something like a glue type of resin.

12  Q      Out of all of the items that were sent to the crime lab,

13  was the crime lab ever able to come back and say that any of

14  the items were Bondo resin?

15  A      Not directly.

16  Q      No.  The only thing that they could say was there was a

17  volatile substance?

18  A      That's correct.

19  Q      Was the Dow can empty when you discovered it?

20              MR. ABELN:  Is that the red can?

21              MR. BORDEN:  The red can we're going to see in

22  a minute.

23  A      I believe it was.  I'd have to double check my report.

24  I believe it was.

25          Yes, the container was empty, but it had the odor of the

1    same flammable liquid in it.

2    BY MR. BORDEN:

3    Q    It had the odor of gasoline, did it not?

4    A    That's correct.

5    Q    In your opinion, sir, the accelerant in this case was

6    the gasoline placed in the Bondo cans and the Dowgard cans.

7    Is that correct?

8    A    That's correct.

9    Q    Have you gotten any reports that the Bondo Fiberglass

10   resin was used as an accelerant?

11   A    The gasoline being in those particular cans, it could

12   have been a foreign substance mixed with the gasoline that

13   could have been added to the flammability.  That stuff -- that

14   particular resin is flammable.

15   Q    Let me repeat the question again.  Have you gotten any

16   reports that the Bondo Fiberglass resin was used as an

17   accelerant, or was it the gasoline?

18   A    The gasoline is in the same can.

19   Q    So are you -- is your response yes?

20              THE COURT:  Trooper, answer the question.

21   BY MR. BORDEN:

22   Q    I will repeat it one more time.  Have you gotten any

23   reports that Bondo Fiberglass resin was used as an accelerant?

24   A    I got no reports on that, no.

25              [Commonwealth's Exhibit No. 23, a Dowgard

1   container, was marked for identification.]

2           MR. BORDEN:   Thank you.

3   BY MR. BORDEN:

4   Q   Trooper, I'm going to show you what has been marked for

5   identification as Exhibit No. 23.   Is this the Dowgard can

6   you found at the scene of the fire?

7   A       That's correct.

8   Q   Is this the Dowgard can that smelled of gasoline?

9   A       That's correct.

10  Q   Just to summarize, at the scene you would have found

11  these three cans, the shirts, the rags, and the matches.   Is

12  that accurate?

13  A   That's accurate.

14  Q   Trooper, these types of things, cans like this, and

15  another Dow can that is filled with gasoline, and then the

16  rags, they are not the kind of things that you find in a

17  secure unit like the Honesdale State Police Barracks.   Is that

18  correct?

19          MR. ABELN:   Objection, your Honor.   Generality

20  of the question.

21          THE COURT:   All right.   Rephrase.   Sustained.

22  Rephrase it.

23  BY MR. BORDEN:

24  Q   Are those the types of things that you find in the

25  Honesdale State Police Barracks, Bondo resin cans, Dow can, a

1  rag with Ward Law on it and shirts and matches?

2                MR. ABELN:  Your Honor, I object again.  Same

3  reason.

4                THE COURT:  Come up here, please.

5                [The following discussion took place at side

6  bar.]

7                THE COURT:  I'm not so sure I understand your

8  purpose of your question or your purpose of your objection.

9                MR. BORDEN:  The purpose of my question is to

10  indicate that these items were brought to the scene.  They're

11  not items that are commonly found in barracks, such as --

12                THE COURT:  What's your problem with that

13  question?

14                MR. ABELN:  I just wonder, when he first asked

15  the question, whether this Trooper would even be qualified to

16  say it was commonly kept at a barracks such as this.

17                THE COURT:  Why don't you just rephrase the

18  question and ask it like you just asked me.

19                MR. BORDEN:  Okay.

20                [Discussion at side bar concluded.]

21  BY MR.BORDEN:

22  Q    Trooper Moschowsky, from your experience, are these

23  types of items, including the shirts that you found at the

24  scene and the rags, items which are commonly kept or stored

25  at a State Police Barracks?

1    A      Commonly kept in storage?  I'd say no.

2    Q      These are the types of things that somebody would have

3    to lug up there.  Is that correct?

4    A      I would say yes.

5    Q      So somebody, one or two people, or whatever, had to

6    bring this to the scene, from what you have discovered, at

7    least three cans filled with gasoline, together with the

8    shirts, and the rags, and everything else, and matches,

9    obviously.  Is that correct?

10   A      Not completely.  I testified that there was a possibility

11   that the gasoline could have came from that dump truck that

12   was at the scene.  The cans could have been in whatever

13   vehicle that arrived at the scene, same thing with the

14   container.  I don't know.  This container could have been

15   empty when they were brought to the scene, or it could have

16   been filled.  The gasoline could have been obtained from at

17   the scene from the dump truck.  Exactly where the gasoline

18   came from I'm not sure, but it didn't necessarily have to

19   have been brought there.

20   Q      At one time you had a theory in this case that the

21   gasoline came from the dump truck, did you not?

22   A      Not a theory.  I said it's a possibility because of what

23   I observed around the dump truck, that the gasoline could

24   have.  I don't know.  It might have just been poured in that

25   location from one container to another and got onto the

1    ground that way.  But it did appear that there was some

2    significance to that area around the dump truck.  What exactly,

3    I don't know.

4    Q    Is it sufficient to say that you had a theory that it

5    might have been siphoned out of the truck, but you were unable

6    to establish that?

7    A    I wouldn't say that was a theory.  I would say that was

8    a possibility I came up with when I observed the stain on the

9    ground by the truck.

10    Q    But you couldn't establish it?

11    A    If I remember right, that's correct, I didn't establish

12    whether any gasoline came from that truck or not.

13    Q    At the scene did you discover any type of evidence that

14    a person used any type of extinguisher, specifically a foam

15    extinguisher, to put out this fire?

16    A    Not that I actually detected or was made aware of myself,

17    no.

18    Q    Did your investigation indicate that during the night

19    September 24th or the morning of September 25th that someone

20    had discovered that fire and attempted to extinguish it?

21    A    Did my investigation reveal that?

22    Q    Yes.

23    A    No, it didn't.

24    Q    Mr. Abeln asked you about the use of a timer in

25    connection with matches, and I believe that you indicated that

FORM OR-325    REPORTERS PAPER & MFG. CO    700-626-6313

1  one way to create a timer or a delay device is through the

2  use of putting a match -- I'm sorry, putting a cigarette in a

3  pack of matches. Is that accurate?

4  A    That's correct.

5  Q    Did you find any cigarette butts at or near the scene

6  of the fire?

7  A    Not that I can recall, no.

8  Q    Trooper, to this point in time we've discussed the

9  general layout, what you've discovered at the scene. I want

10  to dwell for a minute on the fire, itself.

11      Would it be a fair statement to say that this was a

12  flash fire?

13  A    Not in a true sense, but in somewhat of -- if you want

14  to refer to it as to whether or not it was a sustaining fire

15  or one that just occurred and then went out, I would say if

16  you're referring to that as a flash fire, then I would say it

17  would be accurate to say it was a flash type fire, but not a

18  true flash fire.

19  Q    It's one that occurred and then went out? You'll agree

20  with that?

21  A    That's correct.

22  Q    Will you also agree with me that it lasted for a short

23  period of time, being defined as 20 minutes or less?

24  A    Correct.

25  Q    Would it be a fair statement to say that the damage was

1   minor?

2   A    I would say that would be a fair statement, taking into

3   consideration how many vehicles are involved.

4   Q    No one was hurt, were they?

5   A    Not to my knowledge, no.

6   Q    The barracks were not burned in any way, was it?

7   A    No, it wasn't.

8   Q    The barracks wasn't scorched in any way?

9   A    No, it wasn't.

10  Q    Do the photographs accurately depict the damage to the

11  vehicles?

12  A    Not really.  You couldn't really make out -- like some

13  of the tires were actually flattened and some of the tires

14  did burn on those vehicles, which I don't believe the

15  photographs are that detailed.  Other than that, I would say

16  in general the photographs more or less depict the amount of

17  damage.

18  Q    Did you find any evidence at the scene that any of those

19  vehicles were completely engulfed in flame?

20  A    No, there was no vehicles engulfed in flame.

21  Q    The Bronco, vehicle No. 14, the one that was confiscated

22  from Mr. Roransky, would you describe again for the jury how

23  that vehicle was damaged?

24  A    Left rear corner, I believe the tire was flattened, gas --

25  the area around the gas cap was charred, and the paint was

FORM OR 325   REPORTERS PAPER & MFG CO.   700-626-6313

1    blackened.  It appeared that a fire did burn for a very short

2    period of time up along that left rear corner of that vehicle

3    and then it was out.

4    Q    And that's it?

5    A    That's it.

6    Q    The vehicle wasn't gutted?

7    A    No, it wasn't.

8    Q    It wasn't burned to the extent that it became wall to

9    wall rust?

10   A    That's correct.

11   Q    You testified as part of this investigation when you

12   went out there the rear window of that vehicle was opened.  Is

13   that correct?

14   A    The left rear side window.

15   Q    Were those photographs taken at your direction?

16   A    I requested the photographs to be taken.  Trooper Zanin

17   just took them at his discretion.  I was doing something else

18   while he was taking photographs.

19   Q    You're the fire investigator?

20   A    That's correct.

21   Q    Yet we have someone else who's out taking the photographs

22   rather than yourself, personally, or someone under your

23   direction?

24   A    He's the expert photographer for the State Police, so I

25   had him come out and do the photographs.

FORM OR 325   REPORTERS PAPER & MFG CO   800-626-6313

1   Q   Did you tell him what you wanted photographs of?

2   A   I told him I wanted all the areas photographed; I wanted

3  the container photographed.  I told him take an overall shot.

4   Q   Can you tell us why there is not a photograph of the

5  supposed open window on the Bronco?

6   A   No, I can't, unfortunately.  If I was taking the

7  photographs, I probably would have taken it.  I probably would

8  have taken a more direct shot or full shot, rather, of the

9  actual vehicles that were involved.

10  Q   You testified about some fingerprints that were found.

11          MR. ABELN:  Objection, your Honor.  It wasn't --

12          THE COURT:  Sustained.

13          MR. BORDEN:  I'm sorry.

14  BY MR. BORDEN:

15   Q   You testified about some prints of some kind that were

16  found on these cans.  Is that right?

17   A   That's right.

18   Q   On one of the cans you indicated was found, and it's

19  been stipulated to, was a mark of a Playtex plastic glove.

20  Is that correct?

21   A   Rubber glove.  That's correct.

22   Q   That led you to the conclusion that the person that was

23  wearing that -- that handled that can was wearing Playtex

24  rubber gloves.  Is that correct?

25   A   No.  The report indicated that it appeared to have been

FORM OR 325   REPORTERS PAPER & MFG C   800-626-6313

1   a rubber glove, Playtex type, was found on that can, and I

2   believe I testified as somewhere along the line that can,

3   obviously, might have been handled by someone with a rubber

4   glove. Could have been at that time, could have been before

5   that time.

6   Q    But that evidence is not inconsistent with the conclusion

7   that the person that did handle that can at the time of the

8   arson could have been wearing Playtex plastic gloves. Is that

9   accurate?

10  A    Could have been. That's correct.

11  Q    On the other can was found, and Trooper Zanin's report

12  characterized it as a fiber ribbing. Do you recall that?

13  A    Yes, I do.

14  Q    A fiber ribbing, the finding of a fiber ribbing, is

15  consistent with the conclusion that the person that handled

16  that can was wearing cloth gloves. Is that correct?

17  A    That's not the conclusion I came to.

18  Q    If you were wearing cloth gloves and you handled that

19  can, could a fiber ribbing mark result?

20  A    I'd say it's possible.

21  Q    So the evidence in terms of what was found on those cans

22  is not inconsistent with the conclusion that there were two

23  people there the night of that fire, one wearing Playtex

24  plastic gloves, and the other wearing cloth gloves. Is that

25  correct?

1          MR. ABELN:  Objection, your Honor.  It's two

2    phrased -- two prong question.  He should limit it to one part

3    and then ask the other part, it would be proper.

4          THE COURT:  Overruled.  Answer the question.

5    A     Again, that's not my conclusion.  Whether someone there

6    was wearing one glove, two gloves, whether the fiber ribbing

7    came from a glove, in fact, I don't know.

8    BY MR. BORDEN:

9    Q     I'm just saying, sir --

10   A     I don't know.

11   Q     -- what was found is not inconsistent with the conclusion

12   I pose to you.  Is that correct?

13   A     Personally, no.  I have to disagree.  I don't see how

14   you can come to that conclusion.  We have established that one

15   of the prints was possibly from a Playtex rubber glove.  The

16   fiber ribbing we -- we're assuming -- you're assuming that

17   it's a glove.  It could have been -- the can could have been

18   up against a piece of fabric and it adhered to the can.  I

19   have no idea where that fiber came from, therefore, I don't

20   make any conclusion.

21   Q     Trooper, my question is very simple.  Does that evidence

22   disprove the theory that there were two people there that

23   night, one wearing Playtex gloves, and the other wearing

24   cloth gloves?

25   A     No, it doesn't.

1  Q    Trooper, you testified -- correct me if I'm wrong -- that

2  there is no doubt in your mind that if these vehicles had

3  exploded, the remainder of the vehicles, the 31, would have

4  gone up.  Is that correct?

5  A    I don't agree with the terminology exploded.

6  Q    All right.  Caught on fire.

7  A    I agree.

8  Q    For that to happen initially, for there to be any fire

9  of 10 vehicles, 15, or 31, and for you to render that opinion,

10  there's got to be a conclusion that these vehicles would have

11  caught on fire in the first place, correct?

12  A    You would have had to have a fire.  That's correct.

13  Q    But we didn't have a fire, did we?

14  A    Yes, we did.

15  Q    We didn't have a fire that was sufficient to ignite 10

16  vehicles, did we?

17  A    The fire that had occurred wasn't sufficient, no, it

18  wasn't.

19  Q    You're giving an opinion, upon the conclusion that these

20  vehicles would have caught on fire.  Is that correct?

21  A    That's correct, that's what the intent was.  They could

22  have.

23  Q    They could have.  You're saying they could have caught

24  on fire, but they didn't.  Tell the jury why they didn't

25  catch on fire.

FORM OR 325   REPORTERS PAPER & MFG. CO   70-626-6313

1   A       Could be a variety of reasons.  A lot of variables

2   involved when you're talking about a fire.

3           For some reason when that flammable liquid trail was

4   ignited -- again, just for some reason -- it just didn't do

5   what it was intended to do.  Some of the wicks did not catch

6   fire, therefore, the fire didn't spread to the vehicles.

7   Obviously, the ground just burned.

8           Maybe the fire wasn't burning that high, or maybe it

9   wasn't exactly that hot to catch the rags on fire.  I really

10  can't say exactly why it didn't work.  It was designed to work.

11  Why it didn't work I don't know.

12  Q       It didn't work or couldn't have worked for several

13  reasons.  Is that accurate?  You don't know why, but there

14  could be several possibilities as to why these vehicles did not

15  go up.  Is that correct?

16  A       That's correct.

17  Q       One of them -- tell me if you disagree with me -- is

18  lack of combustion.  Is that right?

19  A       That's a possibility, yes, it is.

20  Q       Define for the jury combustion.

21  A       Any item that will ignite when an ignition source is

22  brought to it.

23  Q       One of the possibilities is there was not sufficient

24  combustion.  Is that accurate?

25  A       That's accurate.

FORM OR 325   REPORTERS PAPER & MFG CO   90-626-6313

1   Q       Another possibility is that the gas mixture in any of

2   these vehicles was too rich.  Do you agree with that?

3   A       Are you referring to that now, regardless of a fire, or

4   just a mixture of how rich it is inside the gasoline tank?

5   Q       I'm talking about how rich it is inside a gasoline tank.

6   A       The gasoline inside a gasoline tank is obviously rich.

7   It's pure gasoline.

8   Q       If the gasoline in those tanks was too rich, a fire

9   wouldn't have occurred, would it?

10  A       That's a difficult question just to answer yes or no.

11  Q       All right.  Would you explain to the jury what is meant

12  by the term flammable range?

13  A       That's the range at which vapors are given off by a

14  liquid and could be ignited.

15  Q       Let me know if you disagree with this definition:  The

16  difference between the upper and lower flammable limits

17  expressed in terms of percentage of vapor or gas in the air by

18  volume is known as explosive or flammable range.  Do you agree

19  with that?

20  A       That's correct.

21  Q       Would you tell the jury the flammable range of gasoline?

22  A       I'm not exactly sure, but I believe it's somewhere down

23  around 45 degrees below zero.  It has a very high flammable

24  range.  Vapors are given off readily below zero.  I'm not

25  exactly sure how -- I think it's 45.  I'm not positive.  In

FORM OR 325   REPORTERS PAPER & MFG. CO   20-826-6313

1    other words, what that's saying is gasoline at a particular

2    temperature below zero already starts giving off vapors which

3    can be ignited.

4    Q    Trooper, aren't you talking about flash point instead of

5    flammable range?  Isn't the flash point of gasoline minus 45

6    degrees?

7    A    All right.  Flash point. I'm sorry.

8    Q    So you're talking about flash point, and I'm asking you

9    about flammable range.  You agreed with my definition of

10    flammable range?

11    A    That's when gasoline becomes flammable, when it -- at

12    its flash point, when it starts giving off vapors.  As in any

13    gas, once vapors are being given off it's within the flammable

14    range, to my understanding.

15    Q    So it's your understanding --

16    A    In other words --

17    Q    -- that the mixture of gas vapor and oxygen vapor doesn't

18    make any difference?

19    A    No, I didn't say that.

20    Q    Good.  Would you agree with me that the flammable range

21    of gasoline is 1.4 percent to 7.6 percent?

22    A    That I'm not familiar with.

23    Q    Do you disagree with this statement:  The flammable

24    range of gasoline is 1.4 percent to 7.6 percent.  This means

25    that if we have a vapor composed of 1.4 gasoline and 98.6

FORM OR 325   REPORTERS PAPER & MFG. CO   *00-626-6313

1   percent air we could have a flammable mixture.  Any mixture

2   in which gasoline vapor is below 1.4 percent will not ignite

3   because it's too lean.  If the gasoline vapor content is above

4   7.6 percent the vapor will not ignite because it's too rich.

5   Do you agree with that?

6   A    That's correct.  I agree.

7   Q    So we were talking here why we didn't have a fire.  All

8   these fire trails and rags, and there have been pictures up

9   here about vehicle 14's tank scorched, and I think you said

10  that the very rag that was on vehicle 14 was burned to the

11  degree it fell in the gas tank.  Is that correct?

12  A    It didn't fall in the gas tank.  It fell in when I

13  touched it.

14  Q    But we didn't have a fire, right?

15  A    You didn't have a fire to the gasoline tank?

16  Q    Right.

17  A    That's correct.

18  Q    One of the reasons or possibilities we didn't have a

19  fire is because the mixture in these tanks was too rich.  In

20  other words, it was above 7.6 percent, and as a result,

21  regardless of what happened outside that tank, it wasn't going

22  to explode because it was too rich a mixture.  Is that true?

23  A    That's not true.

24  Q    That's not true?  Well, do you disagree with me that

25  gas tanks are so designed that we don't have explosions becaus

FORM OR 325   REPORTERS PAPER & MFG. CO.   700-626-6313

1  they're designed to be too rich?

2  A    I disagree with you, that's correct.

3  Q    Let me backtrack for a minute. We talked about

4  combustion. We talked about the gas in the tanks being too

5  rich. You agreed with the statement that if the vapor mixture

6  in that tank is too rich, then that tank will not explode. Do

7  you agree with that?

8  A    I don't agree with that.

9  Q    Why not?

10 A    You keep referring to the gasoline inside the tank.

11 Q    Right.

12 A    The gasoline inside the tank isn't what's going to

13 ignite. The vapors that that gasoline is giving off and

14 coming up that fill pipe is what's going to ignite.

15 Q    I agree.

16 A    Those vapors, as they're coming up that fill pipe, now,

17 this is where you get into, to more simply put it, if the

18 mixture isn't perfect, it's not going to ignite, but the fact

19 that gasoline is rich in the tank and it's coming up there

20 doesn't mean that the mixture is always too rich and will

21 never ignite.

22     I have investigated fires where the gas tanks blew up;

23 I have investigated fires where they didn't. Sometimes it's

24 too rich; sometimes it isn't. It depends on how much oxygen

25 gets mixed with the vapor. So it can explode, and then it

FORM OR 325   REPORTERS PAPER & MFG CO   00-626-6313

1    might not.  It depends.

2    Q      All right.  What you're talking about is this:  This is

3    a gasoline tank and filled with gasoline somewhere.  Obviously

4    if you take off the top some vapor is going to come out, right?

5    A      That's correct.

6    Q      So when you talked about the area outside the gas --

7    assume this is the cap right here -- you're talking about this

8    area in here and a fire out here.  Is that accurate?

9    A      And the area from the top of the gasoline to the top of

10   the tank.  It's all going to have some air, oxygen.

11   Q      Exactly.  Regardless of whether we're talking about in

12   the tank in this area or out of the tank, if the vapor mixture

13   between oxygen and gasoline is not right there will be no

14   ignition.  True?

15   A      That's true.

16   Q      The amount of vapor that is going to come out of there

17   is a direct correlation to the amount of gasoline in the tank.

18   True?

19   A      I'd say that's true.

20   Q      Fine.  For there to be an explosion or a fire to the

21   degree that you've said you can render an opinion on those

22   10 vehicles, you've got to make a determination as to whether

23   there was a correct vapor mixture.  In other words, there could

24   have been ignition.  Correct?

25   A      I have to make that determination?  No.

1   Q    You gave an opinion that all these vehicles are going to

2   burn, sir.

3   A    I said could.

4   Q    You said I have no doubt.

5   A    That's right.  I have no doubt that all of those vehicles

6   could have burned had the fire broke out the way it was designe

7   to do.

8   Q    For you to render that opinion you've got to make the

9   determination as to the amount of vapor and oxygen.  Is that

10  correct?

11          MR. ABELN:  Objection, your Honor.  He's alread

12  answered the question.

13          THE COURT:  Sustained.

14          MR. BORDEN:  I agree.

15  BY MR. BORDEN:

16  Q    You agreed to that, right?

17          THE COURT:  Sustained.

18  BY MR. BORDEN:

19  Q    Trooper, I want you to go down your chart, the one that

20  you drew, and I want you to tell me, so that we can try to go

21  through this problem together, how much gasoline was in the

22  tank of vehicle 13?

23  A    I have no idea.

24  Q    You don't know?

25  A    No, I don't.

1    Q    Can you tell me how much gasoline was in the tank of

2    vehicle 14?

3    A    No, I can't.

4    Q    We'll keep going.  How about vehicle 15?  Can you tell

5    the jury how much gas was in that tank?

6    A    I have no idea how much gas was in any of the tanks,

7    counselor.

8    Q    That includes 16, 17, 24, 25, 26, and 27, correct?

9    A    That's correct.

10   Q    Not to mention the other 21 cars.  Isn't that accurate?

11   A    That's accurate.

12   Q    Yet not knowing the amount of gasoline, the amount of

13   vapor, that could be created and the possible mixture, you're

14   telling the jury that this fire could have possibly happened?

15   A    That's correct.

16   Q    Do you recall testifying at a preliminary hearing?

17   A    Yes, I do.

18   Q    Do you recall testifying under oath?

19   A    Yes, I do.

20   Q    You testified as an expert witness, and you testified

21   under oath in that other occasion, did you not?

22   A    That's correct.

23   Q    When you testified under oath that was on March 24, 1986

24   Is that correct?

25   A    I'll accept that date.  Without looking it up, I'm not

1   sure of the exact date.

2           MR. ABELN:  I'll concede that that was the day,

3   your Honor.

4           Can you tell me the page number?

5           MR. BORDEN: Sure.

6           THE COURT:  Mr. Borden, how long are you going

7   to be?

8           MR. BORDEN:  Awhile, sir.  You want to take a

9   break?

10          THE COURT:  Yes.  Ladies and gentlemen of the

11  jury, we're going to recess for 15 minutes.  Remember, during

12  this recess or any other recess, let's not discuss the case

13  until all of the evidence is in.

14          REINHARD WAGNER, COURT CRIER:  Going to recess

15  15 minutes.

16          [A recess was taken.]

17          REINHARD WAGNER, COURT CRIER:  Court of Common

18  Pleas come to order.  You may be seated.

19          MR. BORDEN:  Thank you, sir.

20  BY MR. BORDEN:

21  Q    Trooper Moschowsky, I want to backtrack for just a

22  minute.  During the recess did you have a chance, perhaps, to

23  check your notes and check my calculation of the distance

24  being a hundred and four feet?

25  A    I had a better chance to more or less add up some of my

FORM OR 325   REPORTERS PAPER & MFG CO   70-826-6313

1   figures.  That's correct.

2   Q     Is my number of a hundred and four feet accurate?

3   A     I'd say closer to a hundred feet is a lot more accurate

4   than mine was.  That's correct.

5   Q     Put a hundred down.

6            MR. ABELN:  That's to what?

7   BY MR. BORDEN:

8   Q     That is to the distance from the rear of the barracks to

9   the front of vehicle 14.

10  A     Approximately, yes, from the barracks to the vehicle.

11  Q     Now, prior to the recess, your testimony was that the

12  10 vehicles could have ignited, and if that occurred there is

13  no doubt in your mind that the remaining 21 vehicles would

14  have ignited, correct?

15  A     Or the majority.  That's correct.

16  Q     When that occurs there was no doubt in your mind that

17  the barracks would have received damage.  Is that correct?

18  A     It's a good definite possibility.  That's correct.

19  Q     Good definite possibility.  And that the Troopers or the

20  occupants of that building would have been injured.  Is that

21  correct?

22  A     Could have been.

23  Q     Could have been injured?

24  A     That's correct.

25  Q     You recall testifying at the preliminary hearing under

1    cath?

2    A      Yes, I do.

3    Q      At that preliminary hearing I asked you certain question

4              MR. ABELN:  Excuse me.  What page?

5              MR. BORDEN:  Forty-nine.

6    BY MR. BORDEN:

7    Q      You testified as an expert in that particular case?

8    A      That's correct.

9    Q      I asked you the following question:

10           "You testified in response to Mr. Abeln's question that

11   it is conceivable, but I want to go back to his language

12   about worst scenario.  On the basis of what you saw it is

13   conceivable that the barracks could have been damaged.  Is

14   that correct?"

15           "Conceivable, correct."

16   A      I used the word conceivable.  That's correct.

17   Q      Went on, bottom of page 50:

18           "Trooper, anything's conceivable.  It's conceivable that

19   the building will be hit by lightening."

20           Went on with the question.

21           Your answer was:  "To answer truthfully, I would have to

22   venture conceivability and really venture a guess."

23           I went on, and I asked you the question:  "Trooper, all

24   right, now, would it be a fair statement to say that you can'

25   give us an opinion other than it's conceivable?"

FORM OR 325   REPORTERS PAPER & MFG. CO   ''0-626-6313

Case 1:00-cv-01920-SHR-DB    Document 18    Filed 06/15/2001    Page 84 of 126

1    Answer:  "That's correct."

2    I went on, and I asked you about the people that were

3 in the barracks.  I'm now on page 53.

4    Question:  "I want to ask you one last question.  Going

5 back to the worst scenario, the area of conceivability, and

6 the barracks did catch fire somehow, when it's conceivable

7 this occurs, and considering the number of exits that are

8 involved and the equipment that is located in those barracks,

9 was there anything that would have prevented whoever was

10 inside from escaping?"

11    Answer:  "Again, I'm guessing."

12    "You're guessing?"

13    Answer:  "Yes."

14    This preliminary hearing where you testified under oath

15 was on March 24, 1986.  As you state, at that point in time

16 you could only say it was conceivable that the damage would

17 occur.  It was conceivable or I'm guessing as to whether

18 anybody would be hurt.  Yet today you're testifying in front

19 of this jury, and you're using the term I have no doubt.

20 Which version is correct, Trooper?  Which time are you

21 testifying accurately under oath?  Now or when you testified

22 under oath on March 24, 1986?

23 A    Both times.

24 Q    You'll agree with me, sir, that testimony is totally

25 inconsistent?

1   A      No, I don't agree with you.

2   Q      You have rendered an opinion that the ignition of the

3   10 cars, leading to the 21, leading to the barracks, leading

4   to the occupants, you'll agree with me, will you not, for you

5   to render an opinion as to the spread of a fire you have to

6   have some basic information?  Right?

7   A      Basic information, that's correct.

8   Q      We know that you had no information regarding how much

9   gasoline at all was in these cars.  Is that true?

10  A      That's correct.

11  Q      What were the weather conditions on September 24th?

12  A      My understanding, it was cool, possibly dew on the

13  ground.

14  Q      Did you check with the Weather Bureau to find out what

15  the weather conditions were?

16  A      No, I didn't.

17  Q      Would you tell us the wind conditions that day?

18  A      No, I can't.

19  Q      Well, isn't wind a factor in determining how a fire is

20  going to spread?

21  A      Could be a factor.

22  Q      But you didn't check that either?

23  A      No, I didn't.

24  Q      So we don't know, or this jury doesn't know, how much

25  gasoline, what the weather conditions were for sure, what the

Case 1:00-cr-01520-CHR-BB    Document 46    Filed 08/15/2001    Page 86 of 126

1   wind conditions were, what vehicles were parked behind here,

2   and yet it's your testimony under oath that you can render an

3   opinion as to I have no doubt, I'm the one that conducted this

4   investigation, and yet on March 26th the best you could do was

5   it's conceivable.  Is that correct?

6           MR. ABELN:  Objection, your Honor. He's already

7   gone through this.  It's been asked and answered by the witness.

8           THE COURT:  I will allow it one more time.

9   Overruled.

10  BY MR. BORDEN:

11  Q    Is that correct, sir?

12  A    Based on my recollection of the evidence, that is true.

13          MR. BORDEN:  No further questions.

14          MR. ABELN:  May I approach the witness, your

15  Honor?

16          THE COURT:  Yes.

17              REDIRECT EXAMINATION

18  BY MR. ABELN:

19  Q    Trooper, I'm going to show you Commonwealth's Exhibit 1,

20  Commonwealth's Exhibit 2, Commonwealth's Exhibit 15.  Do those

21  pictures accurately represent the situation where the vehicles

22  were parked on the day of the fire?

23  A    That's correct.

24  Q    Did you measure at ny request the length of one of the

25  vehicles?

1   A    I did.

2   Q    What's the length of the patrol car?

3   A    Approximately 15 feet.

4   Q    Now, also, Trooper, there was some questions posed to

5   you about the significance of a gas tank, whether it was full,

6   partially full, or empty.  What's the difference in terms of

7   an arson of an automobile whether the tank is filled or empty?

8   A    The amount of emphasis that's being placed on that is

9   whether or not there were five gallons in the tank or whether

10  there were 15 gallons in the tank in itself is not a major

11  issue.  Had the tank been empty, there was more possibility

12  that an explosion would have even occurred, never mind just

13  the fire.

14       The only significance of gasoline or the amount of

15  gasoline the tank would have would be had the tank ruptured

16  and the gasoline had a chance to spread, then, naturally, if

17  there was more gasoline in the tank you would have had a more

18  widespread flammable liquid fire.  That would have been the

19  only significance.

20       Had all those tanks been empty, they weren't there that

21  long, the tanks would have still had gasoline vapors in them.

22  There is the potential of an explosion was there.  And another

23  thing is whether you're talking about a fire progressing from

24  one vehicle to another, you're not necessarily even talking

25  about the gasoline tank.  With the amount of heat that's being

1   generated from one engulfed vehicle, let's say, with another

2   vehicle being that close to that one vehicle, the glass is

3   going to shatter in the other vehicle, and it's going to

4   ignite the interior or combust the material inside that car,

5   and you're going to have another fire.  And on and on and on

6   to conveivably -- I use that term again -- all the vehicles,

7   or possibly, or in my opinion had one vehicle definitely

8   became involved it definitely could have spread to the rest

9   of the vehicles, thereby definitely making a threat of danger,

10  a threat of danger to the immediate area.

11      I could never testify as an expert what actually could

12  have happened or what would have happened, rather -- I'm sorry

13  what would have happened is another thing.  I could say,

14  though, what could have happened as a result of what was

15  intended that day, and not just based on at the hearing, I

16  made myself perfectly clear after Mr. Abeln got done that that

17  was my intention, that the barracks could have been damaged.

18      On cross-examination I -- I was being referred to the

19  defendant's vehicle, the distance of the defendant's vehicle

20  to the barracks most of the time.  I did not base my opinion

21  on that one vehicle or even just the four vehicles that were

22  damaged.  We had 21 vehicles.  We had possibly -- there were

23  other vehicles in the parking lot.  Even without those

24  vehicles, if the 31 vehicles had ignited there would have been

25  a huge enough fire that with flammable liquid being involved

1    it could have rolled across that macadam, hit the barracks,

2    and possibly caused a fire.  You didn't even need a direct

3    connection.  I have investigated fires where that has happened.

4         MR. ABELN:  No further questions.

5                    RECROSS-EXAMINATION

6    BY MR. BORDEN:

7    Q    Trooper, in response to Mr. Abeln's question, I agree

8    with you totally if the tanks were empty the chances of an

9    explosion would be greater because there would be a greater

10   mixture of oxygen and gasoline vapor.  But we don't know

11   whether those tanks were empty or full, do we?

12   A    No, we don't.

13   Q    I heard you just testify in terms of on one occasion it's

14   conceivable it could have spread, another occasion you said

15   it could have happened, and another occasion you said it's

16   possible, and on another occasion you said definitely.

17        Trooper, you're under oath.  You are the fire

18   investigator in this case.  Isn't it true that the only thing

19   you can tell this jury is that it's conceivable these things

20   would have occurred?

21   A    No.  All the terminologies I used, counselor, were

22   accurate.  When I used the term definite I was using it in

23   conjunction with could have and definitely could have happened,

24   not maybe would have happened or anything like that.  When I

25   use -- I didn't say that a fire definitely would have ignited

Hoschowsky - recross                    111a

1  the other vehicles and definitely would have ignited the

2  barracks. I did not say that.

3      I said there was a definite possibility that that could

4  have happened and did place, in fact -- the barracks would

5  have been placed in danger. That's what my testimony was.

6  We've gone over it so many times, there's a possibility that

7  maybe -- I don't know what's being conceived from my testimony

8  but the bottom line to my testimony at the hearing and in this

9  courtroom here today is that had the fire, the design that

10 was there, worked, there was a definite possibility, a

11 definite possibility, that the barracks could have been placed

12 in danger. No doubt in my mind. It is within a reasonable

13 distance.

14     When you use hundred feet and put it on the board like

15 that, I mean, it could be misleading. I don't want to be

16 misleading.

17 Q    Trooper, I haven't tried to mislead anyone. That's why

18 I took the time to measure this courtroom, so that these

19 ladies and gentlemen fully understand the distance that's

20 involved.

21              MR. BORDEN: I have no further questions.

22              MR. ABELN: No redirect, your Honor.

23              THE COURT: You may step down.

24                        . . .

25

1          REINHARD WAGNER, COURT CRIER:  Court is now

2   in session.  You may be seated.

3          THE COURT:  Good afternoon.  All right, we have

4   the jury, all parties, the defendant.  Proceed.

5          MR. ABELN:  Good afternoon, your Honor.

6          I call Russell W. Thomas to the stand.

7                    ---

8          RUSSELL W. THOMAS, called on behalf of the

9   Commonwealth, having been duly sworn, was examined and testified

10  as follows:

11         LINDA SODEN, COURT CLERK:  Please state your

12  name.

13         THE WITNESS:  Russell W. Thomas, T-h-o-m-a-s.

14                DIRECT EXAMINATION

15  BY MR. ABELN:

16  Q     Your occupation, sir?

17  A     Special Agent, Office of Attorney General, Bureau of

18  Criminal Investigation.

19  Q     What is your current assignment?

20  A     The last two and a half years I've been working an auto

21  theft investigation here in Honesdale, Wayne County, with the

22  State Police.

23  Q     Is that Troopers Novatnak and Golden?

24  A     Yes, sir, and also Special Agent Farcus from my office.

25  Q     Do you know the defendant in this case?

1    A    Yes, sir, I do.

2    Q    Would you point him out, please.

3    A    Steven Romansky, seated there at the table.

4    Q    Do you know Thomas Smithers?

5    A    Yes, I do.

6    Q    When Mr. Romansky's Bronco was seized, did you have an

7    opportunity through your investigation to find out where that

8    Bronco had been inspected?

9    A    Yes, sir, I did.

10   Q    Where was it?

11   A    At the garage owned by Thomas Smithers.

12   Q    Did you have an opportunity to review the inspection

13   records pertinent to this Bronco?

14   A    Yes, sir.

15   Q    Did you have an opportunity to interview Thomas Smithers?

16   A    Yes, sir.

17   Q    What did he tell you relative to the Bronco and the

18   inspection stickers?

19             MR. BORDEN:  Objection, hearsay.

20             Could we approach the bench?

21             [The following discussion took place at side

22   bar.]

23             MR. BORDEN:  I didn't know that Mr. Thomas was

24   going to be a witness.  I don't know where you're going, but

25   I would ask for an offer of proof.

1          MR. ABELN:  I intend to offer Mr. Thomas as the

2  person who was involved in the consentual interception to

3  identify the fact that they occurred, that he reviewed the

4  tapes, and that the transcripts were done correctly.  I also

5  want to have him testify to the fact that -- we entered into

6  a plea agreement -- we entered into an agreement with Mr.

7  Smithers during the course of our investigation of Mr. Romansky

8  that Mr. Smithers would agree to wear a consentual inter-

9  ception device.

10          Mr. Thomas was contacted by Mr. Smithers, and I

11  want to lay the background as to why he was contacted.

12          Mr. Smithers is present in the courtroom.  I

13  anticipate that he is going to be -- that counsel is going to

14  try to discredit Mr. Smithers as to his involvement in criminal

15  activity.

16          I would ask Mr. Thomas to testify as to his

17  investigation of the inspection station, his discussions with

18  Mr. Smithers, and his decision not to pursue any further

19  criminal investigation on behalf of Mr. Smithers.

20          MR. BORDEN:  I view the situation where I do not

21  object to his testifying yes, there was a consentual tape; yes

22  it was with Mr. Smithers, and that's it.  As far as going into

23  the criminal background of Mr. Smithers and going through

24  inspection stations and everything else I feel is totally

25  irrelevant and highly prejudicial.

1      MR. ABELN:  It's pertinent, your Honor, in two

2  ways:  One is pertinent to the fact that Mr. Smithers did

3  inspect, or his station did inspect, the Bronco.  Secondly, it

4  goes to the complete investigation that was conducted in this

5  particular charge.

6      MR. BORDEN:  This is not a car theft case.  This

7  has nothing -- we aren't here to prove the Bronco was stolen

8  or not or anything about it.

9      MR. ABELN:  I'm not going to offer any evidence

10 through Mr. Thomas or Mr. Smithers or anybody else as to the

11 course of this car, only that Mr. Thomas had investigated Mr.

12 Smithers and there was no intention or our office whatsoever

13 to prosecute this individual at any time.

14     THE COURT:  Your objection is overruled.  But

15 I caution you, counselor, to be extremely careful in your

16 questions, and your witness better be extremely careful in

17 his answers too.

18     MR. ABELN:  As to what, sir?

19     THE COURT:  The whole background of this.  If

20 it's simply a matter of a slight background, that's fine, but

21 if you're going into a car theft type --

22     MR. ABELN:  No, I am not, sir.

23     THE COURT:  All right.

24     MR. ABELN:  Only as to Mr. Smithers, himself.

25     MR. BORDEN:  I want the record to reflect that

1    nobody has implied or even suggested that they're going to

2    raise the criminal activity of Mr. Smithers.  To put it on at

3    this point in time is indeed premature, and I view it not only

4    as premature, but prejudicial.

5              THE COURT:  Your objection is noted.

6              MR. BORDEN:  As far as my objection on hearsay

7    grounds, which is outstanding --

8              THE COURT:  No, it's not outstanding, I overruled

9    it.

10             [Discussion at side bar concluded.]

11   BY MR. ABELN:

12   Q    In relation to the inspection records of the Bronco, the

13   defendant's Bronco, did Mr. Smithers inspect that Bronco?

14   A    No.  A mechanic employed by him at his station did that,

15   according to the records, and according to what he told me.

16   Q    Was Mr. Smithers called to the grand jury as a witness

17   in regards to the Romansky Bronco?

18   A    Yes, he was.

19   Q    Did the grand jury make recommendations to prosecute

20   individuals involved in an overall -- the activities of your

21   investigation?

22             MR. BORDEN:  Please note my objection.

23             THE COURT:  Overruled.

24   A    Yes, sir, the grand jury made recommendations to

25   prosecute various individuals.

BY MR. ABELN:

Q    Was any such recommendation made in regard to Thomas Smithers?

A    None whatsoever.

Q    Were any of Tom Smithers' cars ever confiscated and impounded behind the Pennsylvania State Police Barracks in Honesdale?

A    No, sir, none.

Q    Did you have an opportunity to discuss with Tom Smithers Steven Romansky at a later time after his grand jury appearance?

A    Yes, sir, on several occasions.

Q    How did it come about that Mr. Smithers became involved in a consentual interception between Mr. Romansky and Mr. Smithers?

A    Mr. Smithers contacted me on several occasions after he left the employ of the Police Department and became a private detective, and informed me confidentially about the activities of Mr. Romansky, and --

                MR. BORDEN:  Objection.  May we approach the bench, please?

                [The following discussion took place at side bar.]

                MR. BORDEN:  At this time I will make a motion for a mistrial.  The Court cautioned counsel about this

1    witness.  He is now indicating he was contacted several times

2    about the activities of my client, not an activity, and it has

3    totally tainted the jury, and I'm asking for a mistrial.

4              MR. ABELN:  Your Honor, he said nothing about

5    criminal involvement.  The activities is what his involvement

6    was personally.

7              I will limit my -- that specifically to that

8    question and rephrase the question, if counsel would like.

9              THE COURT:  Your motion for mistrial is denied.

10             You're playing with fire, though.

11             [Discussion at side bar concluded.]

12   BY MR. ABELN:

13   Q    Did agents of our office, of the office of Attorney

14   General, supervise the consentual interceptions between Mr.

15   Smithers and the defendant?

16   A    Yes, sir.

17   Q    How many --

18   A    On three occasions.

19   Q    Were transcripts made of these conversations?

20   A    Yes, sir, there were.

21   Q    Was a composite tape made that condensed these conver-

22   sations and limited them to the pertinent statements as it

23   pertains to this arson investigation?

24   A    Yes, sir, such a composite was made.

25   Q    Did Mr. Smithers voluntarily agree to do -- participate

1  in these interceptions?

2  A    Yes, sir.  He contacted me initially in early December

3  and voluntarily requested to engage in this consentual

4  interception.  I thereafter contacted you, outlined the facts,

5  and received the approval as required by the statute.

6  Q    Did you participate in my conversation with Mr. Smithers?

7  A    Yes, sir, I did.

8  Q    Is Mr. Smithers here today?

9  A    Yes, sir, he is.

10         MR. ABELN:  Cross-examine.

11              CROSS-EXAMINATION

12  BY MR. BORDEN:

13  Q    Mr. Thomas, so that the record is clear, Mr. Romansky,

14  being my client, has never been convicted of stealing a car,

15  has he?

16         MR. ABELN:  Your Honor?

17         MR. BORDEN:  Has he or hasn't he?

18         THE COURT:  Just a second.

19         MR. ABELN:  Nothing, your Honor.

20         THE COURT:  Okay.  Answer the question.

21  A    No, sir, he's never been convicted of stealing a car,

22  to my knowledge.

23  BY MR. BORDEN:

24  Q    Has he ever been convicted of receiving a stolen car,

25  to your knowledge?

1    A     To my knowledge, he has not been convicted of receiving

2    a stolen car.

3    Q     Mr. Thomas, you are not denying the fact, are you, that

4    a deal was cut with Tom Smithers?  When I say the term deal I

5    mean in exchange for him doing certain things for you, you

6    would agree to do certain things for him.  You don't deny that,

7    do you?

8    A     Well, I would deny that there was a deal cut.  What I

9    would explain is that after the first consentual interception,

10   which occurred, I believe, on the 19th of December, 1985,

11   there arose a question in Mr. Smithers' mind about the

12   propriety of his inspection records and his possible liability

13   with regard to those records.  He consulted with his attorney,

14   Mr. Westervelt, who then spoke to our deputy attorney general,

15   Mr. Abeln, and Mr. Abeln agreed with Mr. Westervelt and Mr.

16   Smithers that the propriety of his inspection records was not

17   the focus of our investigation, and that we would agree that

18   if the records were not proper or in order that there would be

19   no prosecution initiated against Mr. Smithers for those what

20   would be relatively minor infractions.

21   Q     I agree with you till you got to the very end.  It was

22   agreed that Thomas Smithers would not be prosecuted.  When

23   we're talking about altering official documents, you've been

24   involved in enough of these, what kind of charge is that?

25   A     The possible maximum charge could be tampering with

1  public records.

2  Q      And that is?

3  A      What we were talking about were inspection records that

4  Mr. Smithers indicated were handled by various employees of

5  his, sometimes with his knowledge and sometimes without his

6  knowledge --

7  Q      Mr. Thomas, what is the penalty for tampering with

8  official records, if you know?

9  A      I'm not sure, sir.  I'm not certain of the exact penalty.

10 I believe it's a misdemeanor of the first degree.

11 Q      Thank you, sir.

12              MR. BORDEN:  No further questions.

13                     REDIRECT EXAMINATION

14 BY MR. ABELN:

15 Q      Was Mr. Smithers ever prosecuted by anybody for tampering

16 with public records?

17 A      Not to my knowledge, sir.

18 Q      Do you have any evidence that would -- today -- that would

19 show that he had tampered with public records?

20 A      No.  To my knowledge, he has no criminal record or that --

21 to my knowledge, he has not tampered with any public records

22 either.

23 Q      You've investigated --

24 A      It was indicated that there might be some allegation --

25 this was Mr. Smithers' concern, was that during the course of

FORM OR 325  REPORTERS PAPER & MFG. CO.  1-626-6313

1   these consentual interceptions that Mr. Romansky might allege

2   or threaten to expose him in some regard with regard to these

3   inspection records.

4   Q     Did you investigate that?

5   A     Yes, sir.

6   Q     As a police officer and as a special agent of the Bureau

7   of Criminal Investigation, Office of Attorney General, do you

8   have any evidence whatsoever that Mr. Smithers could be arrested

9   for tampering with public records?

10  A     None, sir.

11               MR. ABELN:  That's all.

12               MR. BORDEN:  No further questions.

13               THE COURT:  Thank you.

14               THE WITNESS:  Yes, sir, thank you.

15                         . . .

16               REINHARD WAGNER, COURT CRIER:  Court recess

17  for ten minutes.

18               [A recess was taken.]

19               THE COURT:  We have the defendant here.  The

20  jury is still out, and it's my understanding that you want the

21  standard charge as to the failure of the defendant to take the

22  stand.  Is that correct?

23               MR. BORDEN:  That's correct, sir.

24               THE COURT:  All right.  That's granted.

25               MR. ABELN:  No objection, your Honor.

1    MR. BORDEN:  In addition, your Honor, I would

2  like the record to reflect the fact that the defense has

3  proposed points for charge dealing with an expert witness.

4  It was requested that Nos. 3, 5, 6, 7, and 8, if you read to

5  the jury -- it's my understanding that that request has been

6  denied.

7    THE COURT:  We will cover it generally in the

8  general charge of the Court as to an expert witness, but not

9  specifically as you outlined it.

10    MR. BORDEN:  Thank you, sir.  I would submit

11  the points.

12    THE COURT:  Thank you.

13    Bring the jury in, please.

14    [The jury enters the courtroom.]

15                          ---

16    I hereby certify that the proceedings and

17  evidence are contained fully and accurately in the notes

18  taken by me at the trial in the above matter; and that the

19  foregoing is a true and correct transcript of the same.

20

21    *Sheryl Johnson*

22    SHERYL JOHNSON

23

24

25

FORM OR 325   REPORTERS PAPER & MFG. CO   '0-626-6313

12

COMMONWEALTH                    :    IN THE COURT OF COMMON PLEAS

                                :    OF WAYNE COUNTY, PENNSYLVANIA

                                :    NO. 42 - 1986 - CRIMINAL

VS.                             :    CHARGE:    Ct.#2- Arson & Related
                                                Offenses (Endangering
                                                Property); Ct.#3- Reckless
                                                Burning or Exploding;
                                                Ct#4- Causing or Risking
                                                Catastrophe; Ct#5- Tampering
                                                With Evidence;

STEVEN L. ROMANSKY              :    PROS:    Special Agent, Russell W. Thomas
..  ..  ..  ..  ..  ..  ..  ..  ..  ..  ..  ..  ..  ..  ..

REPORTER'S

NOTES OF TESTIMONY
Tuesday, February 10th, 1987, at
AND NOW,/11:00 A.M., hearing held in

the above entitled cause before the

HONORABLE ROBERT J. CONWAY, President

Judge, Court Room No. 2, Wayne County

Court House, Honesdale, Pennsylvania.


A P P E A R A N C E S

UPON BEHALF OF COMMONWEALTH:     GREGORY L. ABELN, ESQ.
UPON BEHALF OF DEFENDANT:        RANDOLPH T. BORDEN, ESQ.


I N D E X
Witness

                                        Direct        Cross

Defendant's Evidence

Sheriff William Bluff                    2-5        CERTIFIED FROM
                                                    THE RECORD

                                                    APR 1 4 1987

                                                    PROTHONOTARY & CLERK

2.

MR. ABELN:  Your Honor, Steven Romansky is appear-
ing here with his counsel, Mr. Randy Borden, for sentencing,
and I would like to make my remarks at the conclusion of Mr.
Borden's remarks.

THE COURT:  Well, I guess it doesn't make any
difference who goes first. First of all, let's take care of
the Pre-Sentence, have you reviewed that with your client?

MR. BORDEN:  Yes, I have, sir.

THE COURT:  Any corrections or additions that
you would like to make?

MR. BORDEN:  Yes, there is a reference to the
fact that Steven Romansky was arrested for Aggravated Assault
and Resisting Arrest, and that charge is pending.  I would
like the record to reflect the fact that that charge is no
longer pending.  It was nolle-prossed by the District Attorney
of Pike County.

THE COURT:  Alright, is there anything that you
or your client wuld like to say?

MR. BORDEN:  Your Honor, I would like to call
one witness, please.

THE COURT:  Sure.

MR. BORDEN:  Sheriff William Bluff.

SHERIFF WILLIAM BLUFF, CALLED AND SWORN,

DIRECT EXAMINATION

BY MR. BORDEN:

Q  Please state your name.
A  William M. Bluff.

Sheriff Wm. Bluff- Direct          3.

Q  Mr. Bluff, are you here today pursuant to a subpoena?

A  Yes, sir, I am.

Q  And, that subpoena was issued by my office?

A  Yes, it was.

Q  Mr. Bluff, you currently have a position with the County
of Wayne, do you not?

A  Yes, sir.

Q  What is that position?

A  I am the Sheriff and Warden of Wayne County.

Q  How long have you served in that capacity?

A  Seven (7) years.

Q  Has Steven Romansky been incarcerated in the Wayne County
Jail since September 14th of 1986?

A  I believe it is February.

Q  I am sorry, February 14th?

A  I believe February of '86.

          THE COURT:  Correct.

Q  And, during the past twelve (12) months have you had
the opportunity to observe Steven Romansky as an inmate?

A  Yes, sir.

Q  Would you briefly describe for the Judge his conduct as an
inmate in your prison?

A  Well, he has never had any demerits registered against
him for misconduct.

Q  Go ahead.  Has he been cooperative?

A  Yes, sir.

Sheriff Wm. Bluff- Direct          4.

Q  Has he listened to you?

A  Yes.

Q  When he has been instructed by you or a member of your staff to perform a task or do something, has he done that?

A  Yes, sir.

Q  Has he ever threatened you in anyway?

A  To my knowledge, no.

Q  Has he threatened anyone else in the Jail?

A  Not to my knowledge.

Q  Has he volunteered for projects?

A  Yes, he has.

Q  What kinds of projects has he volunteered for?

A  We have a difficult time washing the smoke and filth from the inside of the prison block, the windows which are twenty-five, thirty feet from the floor, and we get a ladder, the inmates hold it, and he goes up and washes the windows.

Q  Did he volunteer to do that?

A  Yes, sir.

Q  What about other service projects, painting and things like that?

A  He and another inmate were instrumental in scrapping down and repainting thirty-one (31) shutters for Bethany Library this past Summer.

Q  During the period that you have known Steven Romansky, over the last, almost a year now, has he been honest and truthful with you?

A  To my knowledge.

Sheriff Wm. Bluff- Direct          5.

MR. BORDEN:  I have nothing further, sir.

MR. ABELN:  No cross examination.

THE COURT:  And, you were here under subpoena, sir?

WITNESS:  Yes, sir, I am.

THE COURT:  Thank you.

MR. BORDEN:  Your Honor, we have no further witnesses, however, I would like to make a statement to the Court.

THE COURT:  Proceed.

MR. BORDEN:  Thank you, sir.

At the offset, Your Honor, the defense believes that the crimes for which the Defendant has been found guilty merge for the purpose of sentencing.  We believe that is true for two different reasons.

First, we believe that the crimes of Reckless Burning or Exploding and the crimes of Causing or Risking a Catastrophe merge because they include the same elements.

Those elements are recklessness, the element of fire, and three, damage of potential damage.

Our research reveals that because these charges are somewhat unique that no Court has ruled as to whether these two particular counts merge or one is a lesser included offense of the other because of the similarity of elements.  As a consequence we believe that this question is one of first impression for Your Honor.

THE COURT:  Are we here to do this now?

MR. BORDEN:  I believe so, Your Honor.  I be-

6.

lieve that I have to raise the issues of merger at the time of sentencing.

THE COURT: Alright.

MR. BORDEN: If, Your Honor, finds that those two particular crimes do not merge because of the similarity of the elements involved we believe that the crimes of Reckless Burning, Risking a Catastrophe and Tampering with Evidence do merge for the purpose of this sentence under the doctrine of the Simple Act Doctrine.

To support this position we have previously provided the Court with several cases on this particular issue. In addition we would point to the case law cited in Commonwealth v. Franklin, and the citation to that is 306 Pa. Super 422, a recent decision by the Pennsylvania Superior Court. In that case the Defendant stood before a Judge such as yourself and he was charged with the crimes of Burglary, and Criminal Trespass. The Superior Court found that those two (2) crimes do not merge because of the similarity of elements and thus it was proper for those counts to go to the Jury, and, indeed, the Defendant could be found guilty on those two (2) separate counts, but when it came time for sentencing the Superior Court ruled that the crimes do merge under the Single Act Doctrine. The test as announced by the Franklin Court is as follows: "In merger of sentence cases we focus primarily on the facts that were proved at Trial for the question is whether those facts showed that impractical effect that the Defendant committed a single act in

which case there will be a merger, and only a single sentence may be imposed" That quote is at Page 806.

In Commonwealth Vs. Linski, the citation to which is 400 At2nd, 184, the question was, do the crimes of arson, and this was the closest case that we could find to Mr. Romansky's case, do the crimes of Arson and Criminal Mischief merge. In that particular case the Court said that they do not merge in similarity of elements, but when it comes time for sentencing but one sentence can be imposed. In stating that the Court said, "In our present case, although there were various consequences to various victims the consequences derive from a single act or transaction, specifically, the burning of the barn, which may be the basis of various charges, but ultimately of only one (1) sentence."

In Mr. Romansky's case there was but a single act, the burning, or should I say, attempted burning of the evidence. As a result it is the Defense's position that these three (3) crimes merge for the purpose of this particular sentence.

Having stated the Defense's position the question becomes what sentence is appropriate for Steven Romansky. That determination is going to be made by Your Honor. Your task, as a Sentencing Judge, is far from an easy one. On the one hand, you have the Defense Counsel, who is pleading for leniency, and on the other hand you have the Attorney General, the Assistant Attorney General, the State Police, clamoring for maximum sentence time. As, Your Honor, knows

8.

one of the things, and, perhaps, one of the most difficult
things, is to stand apart from the two factions.  After
                              has to
listening to what each of us/say to dispense with the emotion
which is a natural part of a lengthy investigation and a long
protracted Court battle, and to impose a sentence which ob-
jectively reflects what the Defendant deserves to receive
under the Law.

What I hope to be able to point out are some of
those objective factors to assist you in carrying out that
difficult task.

First factor, has the Defendant been punished?
I don't believe that anyone would disagree that, yes, he has.
Steven Romansky was incarcerated on February 14th, 1986.  With-
in a four (4) day period he will have forfeited a year of his
life for he will have been in Jail for a period of one (1)
year.  I need not tell Your Honor that within that four (4)
day period he will have already fulfilled the minimum range
under the Sentencing Guidelines.  In addition to being in-
carcerated Steven Romansky has lost a lot more then that.
Because he couldn't work, because he had to pay the cost of
trying to prove that he was innocent Steven Romansky is now
broke.  Steven Romansky has lost the Roofing Business that
he worked so hard for so many years to build up.  His wife
who worked as bookkeeper at that business has lost her job
and now must fare it out a wage as a waitress, the minimum
standard of living.

Steven Romansky and his family have lost their

home.  For fourteen (14) years they lived in the Lake Wallen-
paupack region and paid the rent.   Because Steven can't work
they have lost the house and Mrs. Romansky and the children
are now forced to move in with Steven's parents.

Has Steven Romansky been punished, indeed he has.

A second factor, has Steven Romansky demonstrated
that he can be a productive member of our community?  I be-
lieve that no one will question that he has done that.  As
the Pre-Sentence Report indicates Steven Romansky is married,
and he has two children.  He has been married for the period
of fourteen (14) years.

As I indicated to you, he has established his own
business and has been consistently employed, and as that Pre-
Sentence Report indicates Steven was a hard worker and had
a reputation as an honorable dependable businessman.

Certainly, Steven Romansky is not the type of
individual who all too frequently comes before Your Honor.
The individual who has the juvenile record, the individual
who has been constantly in trouble with the law.  Up until this
point in his life Steven Romansky certainly was a hard work-
ing individual, a married man and a stable member of the
community.

Steven Romansky is the opposite of the criminal
that normally comes before this Court.  Much has been said
in this particular case, Judge, about the tapes that were
recorded by Thomas Smithers and the indirect threats that

appear upon those tapes, which the State Police are lead to conclude that Steven Romansky is a dangerous individual. The only reason 1 raise that is that it was addressed in the Pre-Sentence.

The question is, is that conclusion based upon the objective criteria, information we know about Steven Romansky?

The first thing, I would say is, "Let's look at the criminal record of Steven Romansky." Does he have a history of violent acts? The answer to that question is, "No."

Second, what do the neighbors think about Steven Romansky? Fortunately, the Probation Department took the time to find out and interviewed the neighbor, the neighbor of fifteen (15) years and that neighbor reported, "We have never known him to be dangerous or abusive," and that person felt he was hard working and a caring family provider.

Thirdly, the facts that we know, and that fact that they proved what was said, on that day in January of 1986, proved that Steven Romansky at best, when he made those statements can be classified as a "bag of wind". Those statements were made in January of 1986. The arson in this case occurred in September of 1984. Did Steven Romansky do anything to make us believe that we should take those boasts with any "grain of salt"?, and the answer to that is, "No."

You might recall, Judge, Trooper Moschowsky testified that the fire in this particular case was a "flash fire".

11.

It took a matter of seconds, a matter of minutes at the most.
Certainly, if Steven Romansky was there, and I will point out
that he always said that he wasn't, he was innocent in this
case, but if he was, Steven Romansky knew that fire was a
failure.  He knew the fire was a failure in September of 1984
yet subsequent to that date we have no second attempt to turn
that fire into a reality.

In addition, we have no indication that Steven
Romansky wrote letters to the State Police threatening them,
called the State Police threatening them.  We have no evidence
that Mr. Romansky went out and bought a gun, bought a weapon
or anything like that.  We have no evidence that Mr. Romansky
committed any type of assault since September of 1984.

What did Steven Romansky do after the fire, assum-
ing that he was there, he went back to work.  He didn't carry
out any of those threats that he was supposed to to his friend
at that time.

Your Honor, has heard the testimony of Sheriff
Bluff.  Sheriff Bluff has indicated  that over the past year
Steven Romansky has been cooperative, he has done what he
has been ask to do, he has volunteered and he has done
community projects.  This is the type of individual who the
State Police would make you believe is a revengeful type per-
son.  I suggest that facts, as we know them suggest to you
the contrary.

Your Honor, considering his prior record, what his
neighbors say about him, his conduct after September 25th,

12.

1984, and his conduct while in prison, suggest that the re-
marks that have been so blown out in proportion in this par-
ticular case are in fact meaningless.

Now, I know, or I can suggest what Mr. Abeln is
going to say when he gets up here, because we have been in
Court too many times before, and he is going to get up, and
he is going to say, "Your Honor, the Defendant, in this case,
Steven Romansky, intentionally went up to the Honesdale Bar-
racks and set a fire for which he deserves to be punished."

The purpose of this sentencing, we don't disagree
with that, but the issue is when does the punishment stop,
when does the rehabilitation, and the ability to join your
family begin? I ask, Your Honor, as I know you will do, to
stand back, dispense with the speculation, the rumor, and,
indeed, the pressure, and to pass sentence on Steven Romansky
upon the objective facts as we know them.

Steven Romansky committed a crime; Steven Romansky
has been punished. Prior to this point in his life, he had
a family, he had a business and he worked hard in the com-
munity.

Since the date of his incarceration he has served
as virtually a model prison.

Your Honor, I ask for leniency in this case, not
for the sake of leniency in and of itself, but because the
facts warrant it.

Thank you. I do not know of Mr. Romansky has
anything to say to the Court or not. Mr. Romansky, you have

13.

the opportunity to address Judge Conway at this time, if you
would like to.

MR. ROMANSKY:  The only thing that I would like
to add is that I would like to listen to the tapes myself, if
I may?

THE COURT:  I am not going to allow it  now
that you sat during a Trial and heard them provided, and the
Jury.  If you would like to say something that would be favor-
able to you, I assume that is what you want to say, and I
would be very happy to hear it now.

MR. ROMANSKY:  The only thing that I would like to
do is to listen to the tapes because when the time is done
and over with, I would still like to come back and start again.

THE COURT:  Well, I will consider them, I recall
what the tapes said, I will consider that.

MR. ROMANSKY:  Thank you.

MR ABLEN:  Your Honor, Mr. Romansky was found
guilty of Arson & Related Offenses, Reckless Buring or Ex-
ploding, Causing or Risking a Catastrophe and Tampering With
Evidence.  He was acquitted of the first charge, Arson and
Endangering Persons, and after Post Trial Motions the Court
found that Arson and Endangering Property was not established
to the Court's satisfaction, and in dealing with the issue of
merger, Your Honor, I would, first, suggest to the Court that
this is not a case for merger, there is three (3) different
things that are determined as to whether the charges merge,

14.

and it has been clear in the Appellate Courts that if Mr. Romansky was standing here today facing the charges of Arson and Endangering Property, and Arson, Reckless Burning and Exploding, those two (2) charges would indeed merge, because they are of the same degree and are underneath the same statute.

We have three (3) separate statutes here, and there were three (3) separate purposes that were established at Trial, and there are three (3) tests for whether or not charges should merge, and Mr. Borden correctly said that whether one crime necessarily involves another, and that is whether the essential elements of one must be the essential elements of the other.

I suggest to the Court that the essential elements of all three (3) of these are totally different.  Mr. Romansky was convicted of Arson, Reckless Buring and Exploding for placing the personal property of the other people owning the cars, having a value of $5,000.00 or more in danger of damage or destruction.  That was properly established by all the facts at Trial.

He was also charged with Causing or Risking a Catastrophe, and was convicted of Risking a Catastrophe, which under Subsection (b) says that if he recklessly creates a risk of catastrophe in the employment of fire or other dangerous means.

Now, the catastrophe didn't include just the

15.

burning of the cars.  The catastrophe was, what could of happened to that entire area around the State Police Barracks at the time that this fire occurred.  There was sufficient facts established at Trial that the Jury believe that and they found him guilty of such.

The charge of Tampering With Physical Evidence was, again, established by facts too, in that he had his own car put into this impounded lot, and the fire trail lead directly up to this car, and it was the only car where there was gasoline stashed inside the car.  All of which established the separate facts.

Your Honor, another test is, again, on whether the merger should be considered is whether the gradations are the same, and in this case the gradations for Reckless Burning or Exploding is a Felony of the Third Degree, and Causing or Risking Catastrophe is also a Felony of the Third Degree, and I suggest, Your Honor, that that is not even an issue here, and that in (b) there would not be any case law on this.

Now, in getting to the sentencing itself, Your Honor, I have to suggest that by reviewing the guidelines, they are published by the Pennsylvania Legislature, we see that Causing or Risking a Catastrophe, Arson, Reckless Burning or Exploding and Tampering With Evidence together provide a maximum total of sixteen (16) years incarceration, and Thirty-five thousand ($35,000.00) Dollars fine.  The offense gravity score for the Felony Threes or Fours, and the Tam-

16.

pering of Evidence is a Misdemeanor of the Second Degree, and has an Offense Gravity Score of two (2).

Now, it is my position that this crime that occurred, and these crimes for which he is convicted, are of the most serious in heinous nature of any of the charges that I have brought against any individuals since I have been Prosecutor. I would like to request the Court that the Court consider deviating from the Sentencing Guidelines and imposing the maximum possible punishment on this Defendant.

It is clear from the Appellate Courts that the Court may deviate from the Sentencing Guidelines and go above the aggravating guidlines if it simply provides a written statement of his reasons for doing so at the conclusion of the sentencing.

To determine your alternatives, Judge, and to determine whether this is mitigating, aggravating or even to exceed the guidelines, the Courts have also said that you have to take a look at three (3) basic things. The rehabilitative need for the Defendant, the gravity of the offense as it relates to the impact on the life of the victims, and the community wherein the crime was committed, and, finally, for the protection of the public.

You certainly have a lot of latitude, and the Courts have also said that when you inquire into the personal character and circumstances of the Defendant, you have to consider the Defendant's potential for rehabilitation,

and that is, basically, classified under Manifestation of Social Conscience accepting responsibility for the criminal acts through contrition and repentence as observed through cooperation with the law enforcement authorities. In all three (3) categories, Your Honor, Steven Romansky has failed in any consideration along those lines. He has not shown the manifestation of social conscience, and, indeed, quite the opposite, I believe, and I would like to read one portion of the tapes that were read to the Jury at Trial just to give an illustration of this particular Defendant's attitude toward other people, and authority in general. He has never accepted responsibility for what he has done. He has shown no contrition, and he had an opportunity to speak to you today to ask for mercy and show that he is, indeed, sorry for what he has done.

All along, even with his discussions with the Probation Department, with the Police, and with anybody else, he has totally denied his activity, and, in fact, has blamed other people and claimed a conspiracy against him. There has been no cooperation with law enforcement authority with anything that I have offered him or anybody else.

Your Honor, it seems to me that when a person makes statements such as this, when Smithers said to him, "What about the fire, I think that is another thing that you are "pissed off" about?" "Well, too bad, I ain't even fucking started to slap them in their faces. When I am done, fucking, slapping them they won't have nothing to drive. I know where

18.

everyone of them "mother fuckers" live.  I know everyone of their kids, where the fuck they go to school, what time they getup in the morning, I know all that."  I could read other portions of that about his threats towards the police officers, towards doing other damage to other areas, and I suggest that this escolates the value of this crime beyond all imagination.

Now, Your Honor, the aggravating circumstances rationale is certainly one of the severity of the offense.  In that category there is no question that his going into the State Police Barracks and setting this fire was an attack on authority.  It was designed premeditatively and with malice and forethought to destroy the evidence that we were going to use against him in a case in Pike County for the theft of cars that he had.  It was designed not only to blow up his car, but to blow up the cars to the right and to the left, and, finally, it was based on revenge.  This individual has repeatedly given and made statements about that in that regard, Your Honor, and I think the Court has to take that into consideration in giving him a sentence today.

As I mentioned before, there is no admission of guilt and then there has been this threatening behavior. It would seem to me that under the aggravating circumstances that that would give him one and one-half (1 1/2) year, that would be twelve (12), I believe, to eighteen (18) months category for each of the Felony Three (3), and a one (1) year

category for the Tampering With Evidence charge giving him,
giving him a possible sentence under the Aggravated Range of
four (4) to eight (8) years.  However, as I indicated the
maximum total for this sentence is sixteen (16) years and
Thirty-five thousand ($35,000.00) Dollars for all three.

I would suggest that the records replete with this
type of behavior and this type of threat, and I think the
crime itself is so severe that it should fall outside this
offense gravity score of four (4).

Your Honor, I would highly suggest that this in-
dividual be sentenced to the maximum possible punishment
and give a maximum possible fine.

THE COURT:  Mr. Romansky, I have reviewed several
times the seven (7) page Pre-Sentence Investigation Report.
I have taken into consideration that you have had one prior
arrrest back in '83, Criminal Trespass, for which you were
given a probationary period of time.  I do note, but I do
not take into consideration that you are awaiting sentence
in Monroe County and I believe that you are awaiting trial
in Pike County, am I correct on that?

MR. BORDEN:  That is correct, sir.

THE COURT:  I do remember the tapes, and they
were certainly not favorable to you at all, and you said them?

MR. ROMANSKY:  Yes, sir.

THE COURT:  And the crime that you are charged
with, it was lucky that no one was hurt, let me put it that

20.

way.  It was premeditated, it was planned, but the execution wasn't good enough as far as you were concerned.  You do have a decent family background, so, I am going to stay within the guidelines.

As to Count No. 3, Recklessly Burning or Exploding, it is the Sentence of this Court that you STEVEN L. ROMANSKY pay the costs of prosecution, undergo imprisonment in a State Correctional Institution for a period of not less than one and one-half (1 1/2) years nor more than four (4) years.

Count No. 4, Causing or Risking a Catastrophe, it is is the Sentence of this Court that you, STEVEN L. ROMANSKY, pay the costs of prosecution, undergo imprisonment in a State Institution for a period of not less than one and one-half (1 1/2) years nor more than four (4) years, to run consecutively with Count No. 3.

Count no. 5, Tampering With Evidence, it is the Sentence of this Court that you, STEVEN L. ROMANSKY, pay the costs of prosecution, undergo imprisonment in a State Correctional Institution for a period of not less than one (1) year nor more than two (2) years, to run consecutively with the two (2) prior counts.

So, it is a total of four (4) years, the maximum under the guidelines.  I have stayed within the guidelines, but barely.  Obviously, I do not agree that they merge.

MR. ABELN:  Did you consider a fine in this mat-

ter, Your Honor?

THE COURT:  I think with four (4) to eight (8) years that is ridiculous.

MR. BORDEN:  Your Honor, credit for time served, sir?

THE COURT:  Certainly, that is the law.

MR. BORDEN:  Thank you.

MR. ABLEN:  I will be happy to read him his rights, Your Honor.

THE COURT:  I will take care of that.

You have the right to file motions challenging the propriety of the sentence imposed, and since you were sentenced you may challenge the validity of that sentence within ten (10) days of today.  You are further advised that you are entitled to the assistance of counsel in the preparation and presentation of these motions and if you cannot afford one, counsel will be provided for you at no expense to you.

I am also advising you that you have the right to appeal these proceedings to the Superior Court of Pennsylvania within thirty (30) days of today.  Again, you are entitled to the assistance of counsel in the preparation of this appeal and if you cannot afford one, counsel will be provided for you at no expense to you.

Finally, I am advising you that only such claims which were first raised in this Court may be raised on any appeal to the Superior Court.

Do you understand?

MR. ROMANSKY:  Yes.

THE COURT:  O'kay, I hope that you will take these next four (4) years to straighten out your life or your future.

MR. ABELN:  Thank you, Your Honor.

MR. BORDEN:  Thank you, Your Honor.

HEARING ENDED AT 11:25 A.M.

14(

REPORTER'S CERTIFICATE

I hereby certify that the above is a true
and correct transcript of the notes of tes-
timony taken by me at hearing held in the
said cause.

/S/Lois H. Brown
Lois H. Brown,
Official Court Reporter
22nd Judicial District
Court House
Honesdale, Pennsylvania 18431

O R D E R

The foregoing notes of testimony taken at
said hearing are hereby approved and di-
rected to be filed.

/S/ Robert J. Conway
Robert J. Conway,
President Judge

DATE: *April 13, 1987*