# APPENDIX "A"

IN THE COURT OF COMMON PLEAS
DAUPHIN COUNTY, PENNSYLVANIA

IN RE:                  :   SUPREME COURT OF PENNSYLVANIA
                       :   23 M.D. MISC. DKT. 1983

THE THIRD STATEWIDE     : 

                       :   DAUPHIN COUNTY COMMON PLEAS

INVESTIGATING GRAND JURY   :   NO. 150 M.D. 1984

                       :

                       :   NOTICE NO. 7

## ORDER

AND NOW, this _1st_ day of _February_, 1999, upon consideration of the Motion to Vacate Sealing Order, it is hereby

ORDERED, that the Order of February 14, 1986, sealing Presentment No. 48 of the Third Statewide Investigating Grand Jury be and is hereby VACATED, and the Clerk of Courts is DIRECTED to unseal the said Presentment and to make it available, upon request, for public inspection.

BY THE COURT:

G. THOMAS GATES
Supervising Judge

IN THE COURT OF COMMON PLEAS
DAUPHIN COUNTY, PENNSYLVANIA

IN RE:   THE THIRD STATEWIDE      :   Supreme Court of Pennsylvania

         INVESTIGATING GRAND      :   Docket 23 Middle District 1983

         JURY                     :   Dauphin County Common Pleas

                                  :   Docket Number 150 M.D. 1984

### ORDER SEALING PRESENTMENT NO. 48

The Court has accepted Presentment No. 48.  This Presentment shall be sealed and no person shall disclose a return of the Presentment except when necessary for issuance and execution of process.

SO ORDERED this ___24th___ day of February, 1986.


/s/ G. Thomas Gates
G. THOMAS GATES
Supervising Judge
The Third Statewide
Investigating Grand Jury

IN THE COURT OF COMMON PLEAS
DAUPHIN COUNTY, PENNSYLVANIA

IN RE:  THE THIRD STATEWIDE      :  Supreme Court of Pennsylvania

       INVESTIGATING GRAND      :  Docket 23 Middle District 1983

       JURY      :  Dauphin County Common Pleas

                          :  Docket Number 150 M.D. 1984

<u>ORDER ACCEPTING PRESENTMENT NO. 48</u>

    1.  The Court finds Presentment No. 48 of the Third Statewide Investigating Grand Jury is within the authority of said Grand Jury and is in accordance with the provisions of the Investigating Grand Jury Act, 42 Pa. C.S. §4541 <u>et</u> <u>seq.</u>

    2.  The county for conducting the trial of all charges pursuant to this Presentment shall be Wayne County.

    3.  The Attorney General of the Commonwealth of Pennsylvania, or his designee, is hereby authorized to prosecute all defendants and all criminal charges as recommended in this Presentment by instituting criminal proceedings in the aforesaid County.

    SO ORDERED this _____ day of February, 1986.

G. THOMAS GATES
Supervising Judge
The Third Statewide
Investigating Grand Jury

IN THE COURT OF COMMON PLEAS

DAUPHIN COUNTY, PENNSYLVANIA

IN RE:  THE THIRD STATEWIDE        :  Supreme Court of Pennsylvania

        INVESTIGATING GRAND        :  Docket 23 Middle District 1983

        JURY                       :  Dauphin County Common Pleas

                                   :  Docket Number 150 M.D. 1984

TO THE HONORABLE G. THOMAS GATES, SUPERVISING JUDGE:

PRESENTMENT NO. 48

We, the Third Statewide Investigating Grand Jury, duly charged to inquire into offenses against the criminal laws of the Commonwealth, have obtained knowledge of such matters from witnesses sworn by the Court and testifying before us. We find reasonable grounds to believe that various violations of the criminal laws have occurred. So finding with not fewer than twelve concurring we do hereby make this Presentment to the Court.

Foreperson of The Third
Statewide Investigating
Grand Jury

Date: 8/13/86

PRESENTMENT NO. 48

INTRODUCTION

Pursuant to the submission of Notice No. 7, this Investigating Grand Jury began hearing evidence relative to stolen motor vehicles and insurance fraud throughout Pennsylvania. Through education, experience, informant information and eye witness statements, the Office of Attorney General, Bureau of Criminal Investigation (OAG/BCI) and the Pennsylvania State Police (PSP) have learned that groups of individuals have been working together as an enterprise and engaging in racketeering activities to steal and dispose of various types of motor vehicles. This specific investigation has revealed that a group of individuals is operating in the northeastern part of Pennsylvania, New York and New Jersey. They have been obtaining wrecked or other low-cost vehicles in order to acquire vehicle identification number (VIN) plates and titles. They would attach these VIN plates to the fraudulently obtained vehicles and, to the extent necessary, would alter or deface other identification numbers located on the vehicle frames so as to avoid any trace of the original vehicle. These individuals were also engaged in stealing various motor vehicles and dismantling them in order to sell the part or to reassemble other vehicles.

The Grand Jury has heard testimony from Special Agent Russell Thomas of the Office of Attorney General, Bureau of Criminal Investigation, and Troopers Michael Novatnak and

Francis Golden of the PSP about the circumstances surrounding the theft of over 100 different motor vehicles and involving many different people.

The investigators received information that ultimately resulted in the seizure of these vehicles. The confiscated vehicles were transferred to a holding area in the rear of the PSP Barracks in Honesdale, Wayne County, Pennsylvania, where they were examined by Special Agent Michael Fuller of the National Automobile Theft Bureau (NATB), except as otherwise noted.

An earlier presentment issued by this Grand Jury recommended that charges be brought against eighteen different defendants. As a result of their prosecution, the investigators were able to retrieve further information that has led to the issuance of this presentment.

## FACTS

The Grand Jury heard testimony from SA Russell W. Thomas, OAG/BCI, who has been working with PSP Trooper Francis Golden and Michael Novatnak for approximately the last one and one-half years on major auto theft investigations in Northeast Pennsylvania, and also on an arson of the confiscated stolen vehicles at the PSP Barracks in Honesdale, Wayne County, Pennsylvania.

SA Thomas told the Grand Jury that on September 25, 1984, at approximately 8:00 A.M., Donald Bates, an employee of Dorsan Construction Company (which is located behind the PSP Barracks,

on Route 191, Texas Township, Wayne County, Pennsylvania),
discovered evidence of a fire trail in the grassed area coming
from a construction trailer through the grass by Dorsan
Construction, to the area where confiscated suspected stolen
motor vehicles had been placed in impoundment, by the PSP.
Bates reported what he observed to the State Police Station
Commander, Sgt. Henry Lorent, who then ordered an investigation
be conducted. The investigation revealed that someone had set
the vehicles under impoundment on fire. Ten of the vehicles
were directly damaged by this arson in excess of $3,000 as
estimated. The value of these vehicles exceeds $50,000.
Investigation revealed that a green and white Ford Bronco, four
wheel drive, having been confiscated from Steven Romansky on
August 28, 1984, was the center and primary target of the
arson. Also discovered at the arson scene were rags stuffed in
various gas tanks in and around this same vehicle.

A total of 31 stolen vehicles were parked in three lines
and rows in this impoundment area. A total of 10 vehicles were
tampered with and had damage directly caused by the arson.
Some vehicles had burned (melted) tires, others were charred,
and all 10 vehicles had the gas tank caps removed. All 10
vehicles had cloth or rag "trailers" in the gas tank filler
hole or were partially burned, nearby. All of the 10 vehicles
were linked together by a flammable liquid ground "trailer"
that originated from an area near a mobile construction
office," parked near the impounded vehicles. A burned book of
paper matches was found at the end of this ground "trailer."

This bound book of matches was suspected to have been used as a "timer." Two one-gallon cans with the price of $23.00 were recovered, one in the bed of a truck and the other under the door of the green and white Ford Bronco, confiscated from Romansky.

A subsequent laboratory examination report on November 1, 1984, revealed that the accelerants involved were of a volatile substance and that the items were identified as:

> Item #1 - a saturated maroon colored T-shirt, used as a trailer;
>
> Item #3 - a saturated curtain from the interior of Romansky's Ford Bronco;
>
> Item #5 - a saturated gray and green wool type rag.

It was further noted that the interior of Romansky's Ford Bronco had been saturated with a flammable liquid.

When this vehicle had been confiscated by PSP on August 28, 1984, it was driven from the residence of Steven Romansky to the rear of the PSP Barracks, where it was impounded and parked by Trooper Francis Golden. Trooper Golden personally locked all doors and windows of this vehicle. Trooper Golden secured the key to this vehicle inside the PSP Barracks, and maintained such in his custody and control. On the date that the arson was discovered, September 25, 1984, Trooper Golden personally examined Romansky's vehicle, and discovered that this vehicle was unlocked, a side window was open, and that there was no evidence of forced entry to this vehicle.

At the scene of the fire behind the State Police Barracks, was also found two one-gallon cans identified as Bondo Fiberglass Resin. Each can had a piece of masking tape on the top, with the price of $23.00 hand written thereon. Investigation by Trooper Novatnak and others on October 4, 1984, revealed that those Bondo Fiberglass Resin cans were purchased at a paint shop known as Preferred Products, Stroudsburg, Monroe County, Pennsylvania. Trooper Novatnak determined from interviews with employees of this company, that less than ten such Bondo Fiberglass Resin cans were marked with this same price ($23.00), and in this identical manner, by only one of the Preferred Products' employees, who personally identified his writing. A review of the sales records and receipts by Trooper Golden on October 18, 1984, revealed that there was only one sales slip that indicated a cash purchase of three Bondo Fiberglass Resin cans of this same type and size, marked in the identical manner, among all of the sales made by Preferred Products, prior to the date of the arson.

On November 7, 1984, Trooper Golden and others personally showed a copy of this sales slip received from Preferred Products for these items, which was made out for cash rather than in an individual's name, to Stanley Romansky, brother of Steven Romansky. Stanley Romansky admitted to Trooper Golden that he had purchased those three cans of Resin, and some Emeron Paint and Additive from Preferred Products, on June 28, 1984. Stanley Romansky further stated that he took these three cans of Bondo Fiberglass Resin and the Emeron Hardener, along

with the Additive, to Steven Romansky's house, where they
worked on and repaired a boat, using these products.

On October 5, 1984, Trooper Novatnak and others personally
went to the residence of Steven Romansky, Star Route, Box 40,
Sterling, Pike County, Pennsylvania, and after securing a
voluntary consent from Steven Romansky to search his
basement/garage observed a one-gallon can of Bondo Fiberglass
Resin of the same size and same physical appearance as the two
which were discovered in the rear of the PSP Barracks at the
scene of the arson.  Trooper Novatnak requested of Steven
Romansky and received voluntary permission in writing to take
custody of this can of Bondo Fiberglass Resin from Romansky.
This particular can had the identification piece of masking
tape on the top of the can with the price tag hand written
$23.00.  Trooper Novatnak has shown all three of these cans to
the Preferred Products' employee who identified them as having
been marked by him.

On December 12, 1985, Thomas Smithers telephonically
contacted SA Thomas, OAG/BCI, and stated that he had received a
telephone call from Steven Romansky, requesting that he
(Smithers) meet with Romansky.  Smithers agreed to cooperate
with the OAG and PSP and meet with Steven Romansky, in order to
determine what it was that Romansky wanted to discuss with him.

On December 19, 1985, Smithers did personally meet with
Romansky.  Romansky alleged to Smithers that he had an alibi
for the evening of the arson attempt at the PSP Barracks in
Honesdale, September 25, 1984; however, he acknowledged that he

did ask Smithers to drive him to the PSP Barracks in Honesdale,
for the purpose of removing his Ford Bronco, which was
impounded at the rear of the Barracks. Romansky discussed with
Smithers his request that Smithers drive him (Romansky) to a
"fire trail" behind the Barracks.

Romansky stated that "they come to my house and they
confiscated the _____, what that, you mix with fiberglass"
(actually a partially filled one-gallon can of Bondo Fiberglass
Resin-identically marked with a hand-written price tag of
$23.00-the same as two similar cans discovered September 25,
1984, at the arson scene, PSP, Honesdale). Romansky told
Smithers that he (Romansky) "worked alone all his life."
Romansky also told Smithers, there is nothing on the face of
the earth "to stop me, when I want to do it. Nothing. And
that's all there is to it." Romansky continued telling
Smithers, regarding the arson at PSP, Honesdale, "Well, too
bad. I ain't even _____ started to slap them (the police) in
their faces. When I'm done _____ slapping them, they won't
have nothing to drive. I know where everyone of them _____
live. I know every one of their kids. Where the _____ they go
to school. What time they get up in the morning." Romansky
also said, "They (the police) don't come to my house without
six _____ cops." He also said, "There is, there's a big
difference between me and your common crook. Your common crook
goes out and steals, because he has to, he wants to survive.
I'm out there, because I'm going to get even. I'm _____."

Romansky also said, "They (the police) got it fenced in now" (referring to the stolen cars and trucks behind PSP, Honesdale). Romansky told Smithers, "They got trip wires all over the _____ place. And they got guards around them vehicles. All the _____ time, just hoping that someone will come back there. And you know what? If I want to go back there, and bring them guards home with me, I can _____ do it. And that ain't _____. Cause I ain't afraid to go out there and do it. You told me you'd be by my side all the time. And when I wanted to go up there the first time, I knew when I asked you, you didn't have the nerve to do it."

On that same date (December 19, 1985) Smithers asked Romansky if he (Romansky) had anyone help him (Romansky) up there (meaning at the arson scene at PSP, Honesdale). Romansky replied, "I don't need anybody. I'm a one man _____ wrecking crew."

On January 14, 1986, Smithers did again personally meet with Romansky. During this meeting, Smithers questioned Romansky about a particular day that Romansky had come to Smithers' house and asked Smithers to go with him and help him "up there," (referring to the State Police Barracks in Honesdale). Smithers asked Romansky who helped him go to the State Police Barracks and who helped him with the arson. Romansky asked Smithers what made him (Smithers) think that he (Romansky) had any help in doing what he did (referring to the arson). Romansky became concerned that Smithers might be informing on him, and that Smithers, in fact, might be

recording their conversation.  Smithers endeavored to make Romansky feel more comfortable and tried to show him that he was not wearing any type of concealed recording device. Romansky told Smithers he didn't trust him sitting in the car. Romansky said he would answer all of Smithers' questions and tell him everything he wanted to know (regarding the arson at the State Police barracks) and any other questions, if he would get out of the car with Romansky.  Smithers questioned Romansky about "what he used up there" (meaning what type of accelerant Romansky used to burn the vehicles at the State Police Barracks), Romansky said, "It's only the beginning."  Smithers told Romansky that he believed that Romansky took someone else with him the night of the arson, and asked him who he took with him.  Romansky told Smithers that he was believing what he wanted to believe, and indicated that there was no one with him, that he had acted alone.  Romansky told Smithers, "Whatta ya mean.  It's perfectly lit up, I didn't bring anybody with me."  Smithers said to Romansky he'd like to go to the Barracks and see what happened.  Romansky said, "Oh, I can tell you what they look like, they're all fenced in.  They have intercoms laid out there.  Speakers where they can hear mice running through the _____ parking lot and _____."  Smithers then stated, "They would have got you the first night you were there."  Romansky replied, "Well they weren't there the first night.  They waited 'til someone trying to burn them out (sic).  Then they put the fence and speakers and everything in.  They're all fenced in now."  Romansky goes on to say,

"Yea, they ah (the cars), they don't even sit on their property. They sit on another guy's property. They have to pay him rent just to store them vehicles there." Smithers said, "You mean, you mean you, you didn't want to burn them?" Romansky told Smithers, "I did what I wanted to do. I slapped them in the face. I did what I wanted to do." Smithers stated, "You didn't use gas or anything like that?" Romansky stated, "I did what I wanted to do, when um, you get your biggest laugh when the Honesdale Barracks is crippled and has nothing to drive." Smithers questioned Romansky's motives about committing the arson to "just to slap them in the face." Smithers said to Romansky, "You mean you only want to burn them a little bit?" Romansky replied, "I can do what I want to do. They, they told me right there in Harrisburg that the only vehicle that was burned was mine, and that there was gas trails that went around it, and on top of, but mine was the only one that was touched, okay? Now, anybody, that is anybody that knows anything about that fire knows that isn't true. Okay? So that's a way of finding out who knows what. Nobody knows it. They say they had all the evidence they wanted. You know what? They didn't touch my truck until six months _____ later. None of them moves. They have one guy from New York City that checks them vehicles out, and only one guy. They didn't take them to Harrisburg like they said they did to check them out, because I had a guy sit there from the day mine went up there, 'til just recently and watch them every _____ day, every day I paid that guy to sit there. Them vehicles weren't

moved. I know who looked at them. And when they looked at them. And I paid for that. And that's how I know."

Trooper Novatnak again interviewed the former employee of Preferred Products and showed him the three one-gallon cans of "Bondo Fiberglass Resin." These cans are the two cans recovered from the arson scene and the one can which was voluntarily surrendered by Steven Romansky at his residence. After this individual examined all three one-gallon cans, he stated that all three were personally marked by him during the period of his employment at Preferred Products. He identified the three cans because of a small piece of masking tape on each can top and his handwriting, specifically the numbers 23.00 written on each piece of tape.

On January 19, 1986, Thomas Smithers again met with Steven Romansky at the Twin Rocks Restaurant located at a Truck Stop near Interstate 84 on Route 191 in Salem Township, Wayne County, Pennsylvania. This entire meeting between Smithers and Romansky was surveiled by members of the PSP and OAG/ BCI. During this meeting, Smithers again questioned Romansky about the arson at the PSP Barracks in Honesdale. Smithers told Romansky he had seen a copy of the PSP Report involving the arson of cars behind the barracks at PSP Honesdale. Smithers told Romansky some information which he said he read in the PSP report. Romansky disputed Smithers' statements that two people were involved in the arson and said that there was no high grass in the area. He said he knew for sure "there was no two people." Romansky told Smithers that they (the police)

confiscated "fiberglass cans from my house." Romansky said,
"But I don't think that means much, seeing how I have three
different brands of fiberglass in there now, you know?"
Romansky said Smithers, "Two people through a wooded area? You
should know better than that, did you ever see me take anybody
or ask anybody to help when I was doing what I wasn't suppose
to be doing? Who else do you know could do something like
that?"

   Romansky told Smithers, "There's nothing to understand.
They're spitting in the wind, if they try to prove anything.
The worse thing you can do, is hang yourself, you know. This
is what's good about working alone, there's no one that way to
hang you. You have to do it all by yourself." Romansky told
Smithers that he spent two days at the PSP in Honesdale in
order to accomplish the arson. He told Smithers that he went
to the State Police Barracks about eight different times, and
that he had an unidentified person watching the barracks for
him. Smithers asked Romansky about how he lit that fire.
Smithers specifically asked Romansky, "With a timer?" And
Romansky replied, "Yeah." Romansky said, "I wanted to stay and
watch that one." Romansky describes to Smithers that there
were only a few cops on duty at the time and that he stayed to
watch. Romansky told Smithers that he parked a motorcycle
eight or ten miles from the arson scene and that in the two
days while he was at the barracks all he saw were two cops
because he went through the woods." Romansky told Smithers,
"that you can't get caught, that's what the woods are for,

cause people don't get caught when they go through the woods.
Romansky told Smithers that he knows that the property that the
cars were parked on belonged to a construction company and that
the land is not owned by the barracks, that it's owned by the
construction company, that the police lease the land from the
construction firm.  When asked the specific question, by
Smithers, "Tell me how you lit that one."  Romansky responded,
"All it takes is one match.  That's it.  I don't care what
anybody tells ya."

During this conversation, Romansky admitted he caused
damage and burned about a dozen or so cars (trucks).  Smithers
said that he (Romansky) must have gotten an "adrenalin rush,"
Romansky replied, "If you do enough of it, it's like going to
work every day."  Romansky then says, "When you work alone, how
can anybody else give you a hand.  You know, how could anybody
possibly give you any trouble.  You know also, you know how
major the crime gets--it's no different than picking up a pack
of gum out of a grocery store.  You're the only one that knows
you put it in your pocket, how could you get caught?"  Romansky
told Smithers several times that he always works alone except
for when he hired "other people" to watch the cars at the State
Police barracks.  Romansky also bragged to Smithers regarding
the State Police arson, "They haven't made any arrests yet."

Smithers asked Romansky, "What's the ah, what's the paint
cans (Bondo Fiberglass Resin) they got up there on this arson
thing here."  Romansky replies, "Told you, I took ah, ah,
Fiberglass Resin can, that all they got.  I don't know what,

you know . . . I don't know why they took it, or where, or
how, or any reason. They didn't tell me." When Smithers asked
Romansky what he did when he got up there (referring to the
barracks), Romansky stated, "Same thing I always do, tease the
hell out of em."

Romansky in talking about the arson stated, "It isn't that
(the fire) went out right away. It didn't. It was good that
it kind of melted and stayed in the same area, you know what I
mean? It was good. Like a well-oiled plan. Just enough to
get attention. Do you realize what it cost them people to
fence in there like that? Another way if I'd ah known it, is
that they tried to say mine was the only one that burnt. And
they did that right up to Harrisburg. All the way I kept
hearing that line. All the way." Smithers stated, "Well,
wasn't yours the only one?" And Romansky replied, "There was at
least a dozen, at least. I was there for three hours, out
there. . ."

Smithers stated to Romansky, "And you're telling me right
now that you were the only one that went up to there (PSP
Honesdale) and you were the only one that went . . ." Romansky
replied, "I am the only one that does anything--to my cars,
only one, that's it." Smithers stated, "And you didn't take
anything up there to light that?" Romansky responded, "Could
you carry whatever they say? How many things do you think you
could carry at one, you couldn't drive a bike. It takes two
hands and two feet to drive a bike. How long do you think you
can work while it's light, forever? I mean it'd slow you up.

You ain't going to run no where.  How do you drag all that stuff through the woods?  It doesn't make sense.  You know, what is great about everything you do, is when you want to do something, everything you need to do it with usually is right in front of your face.  All the time."  When Smithers asked Romansky how they (referring to the police) knew he had riden a bike (motorcycle) to the location, Romansky replied, "They (the police) didn't."  Romansky went on to say that he had parked his motorcycle eight or ten miles from the location (PSP Honesdale) and that he walked through the woods from there. And then Romansky cautioned Smithers with regard to the fire, that he should deny everything if asked and said, "You have to, because, you know.  I have to deny everything, we don't know nothing about the fires.  I don't want to be telling them one thing and you telling them another, now. . ."

## CONCLUSION

Pursuant to findings made as a result of evidence already received, this Grand Jury recommends that the Attorney for the Commonwealth file criminal charges against Steven L. Romansky, including, but not limited to the listed offenses:

1.  ARSON:  ENDANGERING PERSONS, 18 Pa.C.S.A. §3301(a).

2.  ARSON:  ENDANGERING PROPERTY, 18 Pa.C.S.A. §3301(c).

3.  ARSON:  RECKLESS BURNING OR EXPLODING, 18 Pa.C.S.A. §3301(d).

4.  CAUSING OR RISKING CATASTROPHE, 18 Pa.C.S.A. §3302.

5.  TERRORISTIC THREATS, 18 Pa.C.S.A. §2706.

6.  TAMPERING WITH EVIDENCE, 18 Pa.C.S.A. §4910(1).

7.  OBSTRUCTING THE ADMINISTRATION OF LAW, 18 Pa.C.S.A. §5101.